Frank HAYGOOD, Plaintiff,

v.

Evelle J. YOUNGER, etc., et al., Defendants.

No. Civil S–75–738 LKK.

United States District Court,
E. D. California.

Nov. 30, 1981.

Jack Jacobson, Santa Cruz, Cal., for plaintiff.

George Deukmejian, Atty. Gen., State of Cal., Wm. George Prahl, Deputy Atty. Gen., Sacramento, Cal., for defendants.

## OPINION AND ORDER

KARLTON, District Judge.

In *Haygood v. Younger*, 14 Cal.3d 802, 122 Cal.Rptr. 760, 537 P.2d 880 (1975), the California Supreme Court determined that Frank Haygood had spent almost five years longer in prison than was permitted under the applicable law. After he was released he brought this suit under 42 U.S.C. § 1983, seeking damages against those he believed responsible for his wrongful incarceration. He predicated his claim upon asserted violations of both the due process clause of the fourteenth amendment and the cruel and unusual punishment provisions of the eighth amendment, made applicable to the states under the fourteenth amendment.

After trial, the jury found that defendants Cranke and Seymour caused the plaintiff to be deprived of his constitutionally protected rights, and the court entered judgment accordingly.[1] Those defendants have now moved for judgment notwithstanding the verdict pursuant to F.R.Civ.P. 50(b).[2]

### I

### THE FACTUAL BACKGROUND

The facts relating to the plaintiff's various terms of imprisonment, and the miscalculation which led to his unlawful confinement are set forth in the California Supreme Court's opinion in *In re Haygood*, 14 Cal.3d 802, 804–808, 122 Cal.Rptr. 760, 537 P.2d 880 (1975). It is sufficient for the purposes of this opinion to note that the California Adult Authority erroneously determined that the plaintiff's properly imposed term for escaping from prison did not begin to run until the plaintiff finished serving a term for a robbery which took place *after* the escape. The result of this miscalculation was that, in 1974, Frank Haygood found himself serving time in prison for a robbery term from which he had been "administrative[ly] discharged" as of 1969, and for an escape term from which he should have been discharged in 1969. Furthermore, although he was serving time, he was receiving no credit towards the escape term. With the help of another prisoner, Phillip Gaskill, the plaintiff began contacting prison and Department of Corrections authorities, asking how it was possible that he was not being credited for time served on this term.

1. The plaintiff sought recovery against the state Attorney General, the nine members of the California Adult Authority, the Director of the state Department of Corrections, the warden of Folsom State Prison, the Administrative Officer for the Adult Authority, a correctional counselor at the prison, and defendants Cranke and Seymour. Pursuant to various pretrial motions, the claims against the Attorney General, the Adult Authority members, and the Director were dismissed before trial by the Hon. Thomas J. MacBride. During the pendency of this litigation, Judge MacBride assumed Senior status and the case came to the author of this opinion to be tried. At the close of plaintiff's case, this court directed that verdicts be rendered in favor of the Warden, the Correctional Counselor, and the Administrative Officer, but denied the motion for directed verdict as to defendants Cranke and Seymour.

2. The parties have brought on several post-trial motions. This opinion deals only with the defendants' motion for judgment notwithstanding the verdict. The balance of the matters presented by the parties, as well as the procedural issues, are resolved in an accompanying unpublished memorandum order. My reasons for so limiting the instant published order are explained in this court's opinion in *Kouba v. Allstate Insurance Co.*, 523 F.Supp. 148 at 151, n.2 (E.D.Cal.1981).

In March, 1974, the plaintiff received responses to his inquiries from defendant Harold Cranke, a Records Officer at the prison, and defendant Benjamin Seymour, a Records Officer for the California Department of Corrections. Their responses told the plaintiff, in effect, that his file had been reviewed and that he was lawfully incarcerated under the state's "continuous term policy." With Mr. Gaskill's aid, the plaintiff petitioned the California Supreme Court for a writ of habeas corpus. That Court determined in effect that plaintiff had been held unlawfully, at least since his terms were retroactively fixed in October, 1970. The Court issued the writ of habeas corpus and ordered the plaintiff released forthwith. *In re Haygood*, 14 Cal.3d at 812, 122 Cal.Rptr. 760, 537 P.2d 880.

The liability of the defendants Cranke and Seymour for plaintiff's excessive incarceration was submitted to the jury at the close of trial. The jury was instructed on both the due process and cruel and unusual punishment theories of liability and returned a general verdict against the defendants. The defendants moved for judgment notwithstanding the verdict.

The defendants' chief contention in support of said motion is that the evidence at trial was legally insufficient to prove that defendants Cranke and Seymour *intended* to deprive plaintiff of his constitutional rights, and that any lesser showing fails to meet the state of mind requirement for a damages action based on the eighth and fourteenth amendments. The primary issue, therefore, is what state of mind must the defendants have entertained in order to be liable for violating plaintiff's rights under the eighth and fourteenth amendments.

This issue is best analyzed in three parts: First, what state of mind, if any, is required by 42 U.S.C. § 1983 itself? Second, what showing is required when the statutory action is based on the fourteenth amendment's prohibition against deprivation of liberty without due process? Third, what is the necessary showing for an action based

on the eighth amendment's guarantee against cruel and unusual punishments? I will address each of these questions in turn; in doing so I will apply the ascertained rules to the specifics of this case. Finally, I will briefly discuss the defendants' claim that they are entitled to judgment *non obstante veredicto* based on their good faith defense.[3]

## II

## PARRATT V. TAYLOR: MENTAL STATES

## AND THE REQUIREMENTS OF SECTION 1983

■ The starting point in my consideration of the defendants' motion is section 1983 itself. I conclude that the statute requires no particular state of mind on the defendants' part in order for liability to be imposed. 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

Nothing in the language of that statute either explicitly or implicitly requires that an aggrieved plaintiff prove anything regarding a defendant's state of mind. *See Parratt v. Taylor*, 451 U.S. 527, 534, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981). The Supreme Court, however, has often discussed damage actions under section 1983 as lawsuits sounding in tort. *See, e.g., Imbler v. Pachtman*, 424 U.S. 409, 418, 96 S.Ct. 984,

---

**3.** Plaintiff's erroneous contention that defendants' motion is not timely is disposed of in the

unpublished companion opinion. *See* n.2, *supra.*

989, 47 L.Ed.2d 128 (1976); *Carey v. Piphus,* 435 U.S. 247, 253, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961). Perhaps because most torts involve some form of culpable mental state on the part of the tortfeasor (intent, recklessness, negligence, etc.), the lower courts struggled for years to determine what particular state or states of mind were required by this statutory "tort" action. *See, e.g., Bonner v. Coughlin,* 517 F.2d 1311 (7th Cir. 1975); *Jenkins v. Averett,* 424 F.2d 1228 (4th Cir. 1970); *Patzig v. O'Neil,* 577 F.2d 841 (3d Cir. 1978); *Johnson v. Glick,* 481 F.2d 1028 (2d Cir. 1973); *Arnold v. I.B.M. Corp.,* 637 F.2d 1350 (9th Cir. 1981). The result was an impossible tangle of diverse legal doctrines. *See Parratt v. Taylor,* 451 U.S. 527, 533, 101 S.Ct. 1908, 1911–12, 68 L.Ed.2d 420 (1981).

Over the course of two decades the Supreme Court loosened this knot, strand by strand. In *Monroe v. Pape,* 325 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), the Court held that the civil cause of action provided by section 1983—unlike its criminal law counterpart (18 U.S.C. § 242)—did not require a showing that the defendant acted with the specific intent to deprive the plaintiff of constitutionally protected rights. In *Baker v. McCollan,* 443 U.S. 137, 139–40, 99 S.Ct. 2689, 2691–92, 61 L.Ed.2d 433 (1979), the Court suggested that simple negligence could provide a basis for liability under section 1983. The following year, the Court emphasized that "[b]y the plain terms of section 1983, two—and only two—allegations are required in order to state a cause of action under that statute. First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law." *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1924, 64 L.Ed.2d 572 (1980). Finally, last term, the Supreme Court severed the remaining

threads: in unambiguous terms it announced that there is no state of mind requirement for an action brought under 42 U.S.C. § 1983. *Parratt v. Taylor,* 451 U.S. 527, 534, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1981).

In *Parratt,* an inmate of a Nebraska prison (Taylor) ordered a hobby kit by mail. Contrary to the prison's regular procedures, the prisoner was not notified when the package containing the hobby materials arrived; when he inquired about his materials he was told that the package had been lost. The prisoner filed an action under section 1983, alleging that his fourteenth amendment rights had been violated.[4] The district court held that by negligently failing to follow their own policies the prison officials had deprived the prisoner of his property without affording him due process of law. The district court granted the prisoner summary judgment and the Eighth Circuit affirmed, per curiam. 620 F.2d 307 (8th Cir. 1980). The Supreme Court granted certiorari in the case for the express purpose of deciding "whether mere negligence will support a claim for relief under § 1983." 451 U.S. at 533, 534, 101 S.Ct. at 1911, 1912.

After setting forth the facts and posture of the case, the Court reviewed its own decisions in the area. It concluded that "[s]ection 1983 . . . has never been found by this Court to contain a state of mind requirement. . . Both *Baker v. McCollan* and *Monroe v. Pape* suggest that section 1983 affords a 'civil remedy' for deprivations of federally protected rights caused by persons acting under color of state law *without any express requirement of a particular state of mind.* Accordingly, in any section 1983 action the initial inquiry must focus on whether the two essential elements to a 1983 action are present: (1) whether the conduct complained of was committed under color of state law; and (2) whether this conduct deprived a person of rights, privi-

4. The fourteenth amendment provides, in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

leges, or immunities secured by the Constitution or laws of the United States." 451 U.S. at 535–537, 101 S.Ct. at 1912–13. (Emphasis added).

■ It follows, of course, that the jury's verdict in the instant case is not susceptible to challenge on the ground that the plaintiff did not prove intent and thus failed to satisfy the state of mind requirement of section 1983. Once again, the Supreme Court has held that there simply is no such requirement. Having resolved this threshold question, I now examine whether the plaintiff presented sufficient evidence at trial to satisfy the two elements that are required by section 1983.

Without doubt, defendants Cranke and Seymour, while performing their tasks as state officials, were "acting under color of state law." *Monroe v. Pape*, 365 U.S. 167, 172–87, 81 S.Ct. 473, 476–84, 5 L.Ed.2d 492 (1961); *Parratt v. Taylor*, 451 U.S. 535, 101 S.Ct. 1913, 68 L.Ed.2d 420. "The defendants' conduct was engaged in under color of state law if they were clothed with the authority of the State and were purporting to act thereunder [ ]." *Marshall v. Sawyer*, 301 F.2d 639, 646 (9th Cir. 1962). The defendants in the instant case were both state employees. Both were charged with the responsibility of examining prisoners' records for the purpose, *inter alia*, of determining whether and when the prisoners were entitled to be released. Thus the first element of the action is satisfied.

The second element requires plaintiff to have established that the defendants deprived him, or caused him to be deprived, of some right protected by federal law. 42 U.S.C. § 1983; *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 1924, 64 L.Ed.2d 572 (1980); *Parratt v. Taylor, supra*. In the instant case plaintiff asserted that he was deprived of rights protected by the fourteenth amendment. He tendered to the jury two different theories as to how he has been so deprived.

First, he claimed that insofar as he was confined in prison after his terms had run, he was deprived of his liberty without due process. Thus, in the Supreme Court's words, plaintiff alleges a violation of "the Due Process Clause of the Fourteenth Amendment *simpliciter.*" *Parratt v. Taylor*, 451 U.S. at 536, 101 S.Ct. at 1913. Second, he claimed that this unlawful incarceration amounted to cruel and unusual punishment and thus violated the rights guaranteed him by the eighth amendment. The application of eight amendment protections against the states is another constituent of due process under the fourteenth amendment. *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). It could be said, therefore, that plaintiff is following alternative routes from the same events to, perhaps, the same result. Because each constitutional protection has its own standards, and thus the requisites for violation of each may vary, it is necessary to examine each in turn. In doing so, I will address the defendants' contention that there is some further state of mind requirement required for violation of either of the underlying constitutional claims.

III

THE DUE PROCESS SIMPLICITER
THEORY

■ The more direct of plaintiff's section 1983 claims is that the defendants caused him to be denied his liberty without due process of law. Again, the Supreme Court has instructed the lower courts as to the specific prerequisites that the plaintiff must satisfy in order to prevail on his claim that he was divested of a protected interest without due process of law. After showing that the defendants were acting under color of state law, he must prove:

a. That the interest deprived was constitutionally protected (i.e., life, liberty, or property);

b. That the deprivation was without due process of law; and

c. That the charged defendants subjected him, or caused him to be subjected, to the deprivation. (*See Parratt v. Taylor*, 451 U.S. at 536, 101 S.Ct. at 1913).

## A. *The Protected Interest*

The first of these factors presents no obstacle to this plaintiff. It is manifest that Mr. Haygood was deprived of a protected interest: he lost no less than his liberty. After life itself, no right is more jealously guarded by our Constitution, legal system, and our cultural mores. Yet, as Justice Rehnquist stresses, "[t]he Fourteenth Amendment does not protect against all deprivations of liberty. It protects only against deprivations of liberty 'without due process of law.'" *Baker v. McCollan*, 443 U.S. at 145, 99 S.Ct. at 2695; *Parratt v. Taylor*, 451 U.S. at 536, 101 S.Ct. at 1913. Indeed, for a number of years Frank Haygood was serving a sentence duly imposed by a court of law; there is no assertion that he was *initially* incarcerated without due process. *See, Meachum v. Fano*, 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976). After his term of lawful incarceration came to an end, however, the plaintiff remained in prison. It is that period of unlawful detention which gives rise to the present lawsuit, and it is upon that period the analysis must focus.

## B. *The Process Due*

"Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). At a minimum, the process due this plaintiff was to be sentenced and incarcerated only in the manner and to the extent prescribed by California law. There can be no dispute, however, that the plaintiff was imprisoned for more than 4–½ years after his term, as fixed by state law, came to an end. It follows inevitably that "when his sentence expired, the State lost its power to hold him, and ... his continued detention violate[d] his rights under the Fourteenth Amendment." *McNeil v. Patuxent Institution Director*, 407 U.S. 245, 246, 92 S.Ct. 2083, 2085, 32 L.Ed.2d 719 (1972). In short, the plaintiff did not receive the process due him.

The defendants argue that *Parratt v. Taylor* and *Baker v. McCollan* compel the opposite conclusion. As I shall now demonstrate, the defendants confuse the result in a given case with its teaching. Thus, the Supreme Court applied essentially the same mode of analysis in *Parratt* that I have traced above. In that case, however, the Court concluded that Taylor *had* received the process due him on the facts of his case; thus his claim was denied. On this basis, the instant defendants seek to argue that Haygood's claim must also be rejected. It seems elementary, however, that this court is not bound to deny all future section 1983 claims based on due process *simpliciter* simply because Mr. Taylor (or the plaintiff in *Baker v. McCollan*) failed to make out his cause of action. It is not the disposition of those cases which controls this lawsuit; rather it is the rules of law announced and how those rules were applied to the facts.

In *Parratt*, the Supreme Court—after disposing of the question of mental states and section 1983—applied the factors outlined above to parse the plaintiff's due process claim. The Court determined that the defendants had acted under color of state law, that the plaintiff's hobby kit was "property" in the fourteenth amendment sense, and that plaintiff had been "deprived" of it.[5] The Court then asked whether the plaintiff received the process due him. The process due Mr. Taylor, the Court held, was the opportunity to be heard "at a meaningful time and in a meaningful manner" at some time before Nebraska *finally* deprived him of his property. 101 S.Ct. at 1915 (*quoting Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). This did not mean, though, that the hearing had to take place before the hobby kit was lost; given that the property was lost inadvertently such a hearing obviously could not have been held. According to the Court, then, a hearing before property is seized (or lost) is not always required if the claimant

---

**5.** The Court carefully noted that "the alleged loss, even though negligently caused, amounted to a deprivation." 101 S.Ct. at 1913.

has a "meaningful opportunity" afterwards to regain his or her property, or its equivalent. *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974). In Mr. Taylor's case, the Court noted, Nebraska had a torts claims statute under which the plaintiff could have sued for his hobby kit or its value. 101 S.Ct. 1917. Thus, the Court concluded, the plaintiff in *Parratt* had been afforded all the process that was due him (indeed that was possible to accord him) before being finally deprived of his property. *Id.*

The defendants point out that in *Parratt*, the Supreme Court found that the hearing held *after* the claimant was deprived of certain property interests was sufficient to satisfy due process. They argue that a post-deprivation hearing should also be sufficient to satisfy due process when what is at stake is a deprivation of liberty. Thus, the defendants contend, because California has a tort claims statute under which the plaintiff could have sued,[6] he was foreclosed from bringing this section 1983 action in the federal courts.

This argument, although it is seductive initially, fails to make the crucial distinction between the right guaranteed to the plaintiff by the Due Process Clause, and the remedy which is available to him if that right is breached. The issue that is tendered here is whether the plaintiff's rights were violated, not whether he has a remedy at law for the injury caused him by that violation. That is not to say that the efficacy of a post-deprivation hearing to remedy the injury is not pertinent—that is a factor in considering whether due process has been accorded; it is, however, not the relevant factor in this case.

"[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the governmental function involved as well as the private interest that has been affected by governmental action." *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230

(1961); *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Applying this rule to the instant case, it is clear that the plaintiff was due a hearing before he was imprisoned for a term of years; clearly the plaintiff received such a hearing before he was committed to Folsom in the first instance. But that is the beginning, not the end of the inquiry. It follows from the fact that the plaintiff received a hearing and was lawfully confined that he had a correlative due process right to be released from prison when his lawfully fixed term of imprisonment expired. *McNeil v. Patuxent Institution Director*, 407 U.S. 245, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972); *Johnson v. Mueller*, 415 F.2d 354 (4th Cir. 1969); *Speaks v. McGregor*, 355 F.Supp. 1129 (W.D.Va.1973).

Thus a properly focused analysis reveals that the process to which Mr. Haygood was entitled was to have his liberty restored to him at the precise moment fixed by state law. In *Parratt*, by contrast, the Court held that plaintiff's interest was solely to receive his property, and thus a post-deprivation hearing would suffice, since that process would restore the property itself or its functional equivalent—its value in money. It should go without saying that money is not the equivalent of months of one's life spent in prison.

Even if due process could have been satisfied by providing Frank Haygood a hearing, a hearing held after he was released would not suffice. As *Parratt* teaches, the Constitution requires a hearing before the claimant is *finally* deprived of his interest. 101 S.Ct. at 1908. On these facts, a post-deprivation hearing simply does not and cannot meet that requirement, since once liberty is gone it can never be recovered. Money is compensation for liberty denied; money is not liberty itself. It seems clear, therefore, that the tort action supplied by the state simply will not satisfy due process when what was required was the timely release of the plaintiff.

---

**6.** California Government Code § 810, *et seq.*

Moreover, holding that a tort remedy is all the process due for a deprivation of liberty under the facts of this case would be unsatisfactory for another reason.

Defendants' argument suggests that government officials are permitted under the Due Process Clause to incarcerate individuals for any reason they wish or no reason at all as long as the state later pays those individuals for their lost time. To state the result of the argument is to answer it. Yet this *reductio ad absurdum* is useful to illustrate that what is at issue here is the *nature* of the constitutional right guaranteed. The effect of these guarantees is presumably to set a standard of conduct for government officials. One hopes and expects that most government officials will conform their conduct to these constitutional standards; but for this to happen, it must be clear what is required, not just what the remedy is for the occasional breach.

Finally, the notion that underlies the defendants' argument is simply inconsistent with applicable precedent. In effect, what the defendants propose is no more than a disguised requirement that a plaintiff must exhaust state remedies before bringing a section 1983 action based on due process *simpliciter.* That proposal ignores two decades of case law as well as the history of the statute itself. In *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), after a lengthy discussion of the statutory history, the Supreme Court concluded that section 1983 was not intended merely as a remedy that would stand behind those provided by the states, to come into play only when the state remedies fail to function. Rather, the Court said:

> It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked.

365 U.S. 183, 81 S.Ct. 481. *See also* Comment, *Actionability of Negligence Under § 1983 and the Eighth Amendment.* 127 U.Penn.L.R. 533, 554–555 (1978).

■ In sum, the existence of a state tort cause of action does not establish that Frank Haygood was afforded due process when he was deprived of his liberty, nor does it bar his lawsuit under section 1983. Accordingly, the question was properly submitted to the jury. Nonetheless, defendants argue the jury's verdict cannot be allowed to stand since, they assert, even if there is no mental requisite under the statute, the constitutional provision implicates such a requirement. This argument, as I explain below, must also fail.

### C. *Subjects or Causes to be Subjected*

Defendants contend that they cannot be held liable unless plaintiff has shown that they intentionally acted to deprive him of his liberty.[7] Alternatively, defendants argue that regardless of what standard is applied there was not sufficient evidence for the jury to have found them liable. Neither of these contentions has merit. Once the plaintiff demonstrated that he was deprived of liberty without due process, the only thing he needed to prove regarding these defendants was that they subjected him or caused him to be subjected to the deprivation. The plaintiff introduced evidence sufficient to meet this standard.

I have already noted that section 1983 itself contains no suggestion of a state of mind requirement. Neither can I discern anything in the language of the fourteenth amendment's Due Process Clause that in any sense implies that a person is not "deprived" of his or her rights unless another intentionally (or negligently, for that matter) caused the deprivation. Simply put, the idea that a state of mind requirement is implicit in the Due Process Clause accords with neither its plain words, nor its purpose. The purpose of the great provisions of the fourteenth amendment is to protect the

---

7. A strong argument could be made that the defendants did in fact intend to deprive the plaintiff of his liberty. *See* Part IV, *infra.*

rights of the individual—not to impose punishments on individuals who are "guilty" of violating those rights. Clearly, the fact that the statute imposes liability for violations of the Constitution, does not change the character of the constitutional provision itself. Since, as I have shown, the statute prohibits any violation of the Constitution under color of state law, the notion of "moral guilt or blame" that underlies the requirement of intent in tort is wholly irrelevant. *See* Prosser, *Law of Torts*, 16 (4th ed. 1971).

Nor did the Supreme Court, in *Parratt*, imply an intent requirement into the underlying constitutional claim. In fact, the majority opinion specifically notes that the deprivation to the plaintiff in that case was no less a deprivation for having been negligently caused.[8] Justice Powell, it is true, suggests in his concurring opinion that a state of mind requirement may exist; he argues that: "A 'deprivation' connotes an intentional act denying something to someone, or, at the very least, a deliberate decision not to act to prevent a loss." 101 S.Ct. at 1919 (footnote omitted). Nonetheless, neither the majority, nor any of the four other justices who chose to write separate opinions, joined him in this view.

What remains, therefore, is for the court to determine whether the jury could reasonably conclude that defendants Cranke and Seymour subjected the plaintiff, or caused him to be subjected to the ascertained deprivation of his federally protected rights. *See Yeaman v. United States*, 584 F.2d 322, 326 (9th Cir. 1978). The evidence showed that both defendants were charged with the responsibility of determining when inmates were to be released. Both received letters from the plaintiff protesting the computation of his sentence. Each defendant made

a brief inquiry into the plaintiff's situation, determined that he was serving consecutive terms, and that the Adult Authority had fixed his release date at some time in the future.

Defendant Cranke sent the plaintiff a two line response on a slip of paper informing him that "all terms are tied together." He attached a California Attorney General's opinion stating that "[c]onsecutive sentences are considered as one continuous term and 'neither shall expire until each are completed.'" Defendant Seymour sent the plaintiff a brief letter containing the same information, to which he attached the same opinion.[9]

Clearly it was not what the defendants did that makes them liable to the plaintiff; it was what they failed to do. As the Ninth Circuit has taught:

A person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, *or omits to perform an act which he is legally required to do* that causes the deprivation of which complaint is made."

*Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978) (Emphasis added); *see also Sims v. Adams*, 537 F.2d 829 (5th Cir. 1976). Whether what is involved are acts of commission or omission, the question is: was the defendants' conduct a legal cause of plaintiff's deprivation? *Arnold v. International Business Machines*, 637 F.2d 1350 (9th Cir. 1981). There was ample evidence showing that both defendant Cranke and defendant Seymour were legally required to correctly compute the plaintiff's sentence and to set in motion the process that would lead to his timely release.[10]

---

**8.** *See* note 5, *supra*.

**9.** The defendants' reliance on the Attorney General's opinion is considered further in my discussion of the "good faith" defense, *supra*.

**10.** According to defendant Seymour's job description, he "Plans, organizes, and directs the work and takes action on difficult problems in connection with ... the compilation of inmate

case histories; directs the maintenance of individual inmates' files on a current basis; directs the review, evaluating, and summarizing of documents for inclusion in records and case summaries and personally handles the more difficult cases; directs the review, defining, and recording of terms and sentences shown in commitments and determines schedules on each case to carry out court orders and other legal and administrative provisions relating to

The jury reasonably could have found that these men were charged with ensuring that the plaintiff was either serving the sentence lawfully meted out to him or was released from confinement. The defendants protest, though, that it was not their actions or omissions which caused the plaintiff's unlawful imprisonment; rather, it was a miscalculation made years before by the Adult Authority. It is true that these defendants cannot be liable for the initial period of unauthorized incarceration. In March, 1974, however, the plaintiff's letters put them on notice that something was wrong with his sentence; the period for which the defendants are liable spans from that time until his release, approximately seventeen months later. They are being held to answer not for the mistakes of others, but for their own failure to look past those mistakes, make the necessary calculations, and see to it that the defendant was freed. *Johnson v. Duffy*, supra.

In this regard, the defendants point out that the letters they received failed to raise the specific grounds on which the California Supreme Court eventually ordered the plaintiff released. Thus, they argue, they were never put on *sufficient* notice to invoke their duty independently to recompute the plaintiff's sentence. The answer, of course, is that the assertion is one of fact for the jury. Neither the plaintiff nor the other prisoner aiding him were attorneys; these prisoners had at best limited access to the appropriate material regarding sentencing standards. The jury could reasonably believe that the plaintiff could not be expected to do more than to inform the appropriate authorities that there was something wrong with his sentence. It was the defendants who had the expertise, the full access to records, standards and statutes, and who were charged with the responsibility of enforcing the law. Certainly the jury could have found that these defendants had sufficient notice but nevertheless failed to execute their duties.

Finally, the defendants argue that they are only charged with failure to investigate, and that under *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) they cannot be held liable on that basis. Once again, the defendants confuse the outcome of the case with the rules of law announced in it. An examination of the facts and principles in *Baker* requires me to reject the defendants' argument. In *Baker*, one Leonard McCollan was arrested on narcotics charges and presented a drivers license as identification. The license had been issued to his brother, Linnie Carl, but bore Leonard's picture. Leonard was booked, signed a number of documents, and was released on bail using his brother's name. When Leonard subsequently failed to appear the bondsman sought and obtained a warrant for Linnie Carl's arrest. Linnie Carl was taken into custody on the warrant and was held—despite his protests of mistaken identity—for several days. After the officials finally released him, Linnie Carl brought a section 1983 action against the sheriff who operated the jail. The district court directed a verdict for the defendant; however, the Court of Appeals for the Fifth Circuit reversed, stating that Linnie Carl McCollan had made out a claim for a "[§] 1983 false imprisonment action." 443 U.S. at 141–142, 99 S.Ct. at 2693.

The Supreme Court reversed the Court of Appeals, holding that although the plaintiff

the receipt, custody, and release of inmates; initiates and directs correspondence on legal and casework records; ... directs the computations necessary to determine legal date of parole and discharge of inmates...."

Similarly, defendant Cranke's job description states that he: "Plans, organizes, and assigns work and takes action on difficult problems in connection with ... the compilation of inmate case histories; directs the maintenance of individual inmates' files on a current basis; directs the review, evaluating, and summarizing docu-

ments for inclusion in records and case summaries and personally handles the more difficult cases; reviews, defines, and records terms and sentences shown in commitments and determines schedules on each case to carry out court orders and other legal and administrative provisions relating to the receipt, custody, and release of inmates ... performs computations or supervises the making of computations necessary to determine the legal date of parole and discharge of inmates...."

may have stated a tort claim for false imprisonment, he did not state a cause of action under section 1983 for denial of liberty without due process. The analysis was basically the same one the Court later employed in *Parratt*: the plaintiff had been deprived and the deprivation was of a protected interest; the question, again, was whether his liberty was denied without due process. The Court concluded that Linnie Carl had received all the process due him. He had been arrested pursuant to a valid warrant and upon probable cause. He was not denied his right to a speedy trial at which time (if no sooner) he could establish his innocence. Thus, unlike Frank Haygood, Linnie Carl McCollan was being held *lawfully*, under the authority of state law. 443 U.S. at 143–146, 99 S.Ct. at 2694–95.

The defendants in the present case attempt to make much of language in *Baker* that the Constitution did not impose a duty on the sheriff, when executing a valid arrest warrant, "to investigate independently every claim of innocence . . . ." *Id.* at 146, 99 S.Ct. at 2695. However true that statement may be, it does not follow that a public official never has a duty to investigate, nor that in this case defendants Cranke and Seymour did not have a duty to investigate Frank Haygood's claims of unlawful detention. Indeed, according to their job descriptions that was precisely their duty. Moreover, the Court prefaced its statement in *Baker* by pointing out that "[a] reasonable division of functions between law enforcement officers, committing magistrates, and judicial officers—all of whom may be potential defendants in a § 1983 action—is entirely consistent with 'due process of law.'" *Id.* at 145, 99 S.Ct. at 2695. In other words, the sheriff's duty was only to arrest and detain the plaintiff in a lawful manner. Once the sheriff had "probable cause" he had discharged his duty. It was not the sheriff's job to determine whether the plaintiff was in fact innocent of the charges on which he was held, or to decide whether he should have been released: that responsibility fell to the magistrates and judicial officers. By contrast, in the instant case the jury could have found

that it was the duty of Cranke and of Seymour to ascertain Frank Haygood's term of imprisonment and to see to it that he was released at the end of his term. The jury reasonably could have found that defendants' duty was not performed.

To sum up, the plaintiff adduced sufficient evidence from which the jury could conclude that: (a) the plaintiff was deprived of his liberty; (b) the deprivation occurred without due process of law; and (c) that these defendants subjected plaintiff to the deprivation, or caused him to be subjected to it. Thus plaintiff did all that was required to prove a section 1983 claim based on due process *simpliciter.* As I have explained, neither section 1983 nor the Due Process Clause of the fourteenth amendment requires plaintiff to make any specific showing regarding the defendants' states of mind.

The requirements for plaintiff's cause of action properly focus only on the questions of constitutional harm and causation. In this sense the statute imposes liability regardless of fault. Nonetheless, judicial gloss has provided the defendants with relief from the rigors of the statute. The courts have recognized that officials are not susceptible to liability under section 1983 if they can show that they acted reasonably and in good faith. The defendants' contentions in this regard will be addressed in Part V of this opinion. First, however, I will discuss the sufficiency of the plaintiff's claim to the extent that it relies on the eighth amendment.

IV

THE EIGHTH AMENDMENT THEORY

As a second theory of liability, the plaintiff argued that his incarceration in the maximum security prison at Folsom after his term had ended constituted cruel and unusual punishment. Thus, plaintiff maintained, to the extent that the defendants were responsible for his continued unlawful imprisonment, they caused him to be de-

prived of his rights under the eighth amendment.[11]

At trial this court instructed the jury that:

> In order to find plaintiff has been subjected to cruel and unusual punishment you must find that defendants, or any of them, by their actions intended to punish plaintiff and that this punishment violated the basic prohibition against inhuman treatment.

The defendants contend that there was not sufficient evidence for the jury to find that they violated Frank Haygood's eighth amendment rights, and that they are thus entitled to judgment notwithstanding the verdict as to this theory of liability.[12] I conclude that there was sufficient evidence to support a finding by the jury that defendants Cranke and Seymour intended to punish the plaintiff. In the usual case, that would end the court's discussion of this portion of the defendants' motion.

This is a somewhat unusual case, however, for it involves a number of issues that lie at the heart of section 1983 litigation. One of those issues is whether a plaintiff who complains of cruel and unusual punishment must demonstrate that the parties sued in any sense "intended" to deprive him of his eighth amendment rights. The instant motion allows the court the opportunity to consider this issue free from the pressures of trial, which include the need to make immediate decisions on legal issues. This more deliberate consideration leads me to believe that, even if eighth amendment violations are by definition intentional acts, it need not be proved that the defendants themselves bore that intent. All that the

plaintiff must show is that the defendants *caused* the deprivation to occur.[13] Before discussing in detail the question of intent under the eighth amendment, however, I will address the particular objection raised by the defendants.

A. *The Sufficiency of the Evidence Proving Intent*

The defendants' argument here seems to proceed from the premise that they could be held liable only if they specifically intended to confine the plaintiff. They protest that they had neither the desire nor the power to so harm the plaintiff. The argument misconstrues the meaning of "intent" as that concept applies to the case at bar.

■ On at least one point the law is quite clear: the plaintiff was not required to show that defendants had the *specific* intent to deprive the plaintiff of his constitutional rights. *Monroe v. Pape*, 365 U.S. at 187, 81 S.Ct. at 484. Rather, the defendants are held to have intended the consequences substantially certain to follow from their acts and omissions. *Procunier v. Navarette*, 434 U.S. 555, 566, 98 S.Ct. 855, 862, 55 L.Ed.2d 24 (1978) (*citing* Restatement, Second, of Torts, § 8A); *see also*, Prosser, *supra*, pp. 31–32. The evidence shows that defendants Cranke and Seymour, despite their duty (and power) to inform the appropriate authorities that the plaintiff was entitled to be released, failed to do so. The result, which the defendants knew was substantially certain to occur, was that the plaintiff remained in prison. The jury could reasonably have found that the defendants intended to confine the plaintiff, and that they thus subjected him to cruel

---

11. The eighth amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

12. Because the jury returned a general verdict, if one theory of liability is insufficient under the law a new trial may be required. *Morrissey v. National Maritime Union*, 544 F.2d 19, 26–27 (2d Cir. 1976); *Simko v. C & C Marine Maintenance Co.*, 594 F.2d 960, 967–68 (3d Cir. 1979); *cert. denied* 444 U.S. 833, 100 S.Ct. 64, 62 L.Ed.2d 42 (1980).

13. Although it follows from this conclusion that the instruction given may have been more generous to the defendants than the law required, it did not result in prejudice to either party. Given that the eighth amendment claim was only an alternative theory of liability, and did not represent a separate item of damages, the instruction did not harm the plaintiff for he prevailed nonetheless. Obviously the favorable instruction did not prejudice the defendants.

and unusual punishment.[14] As I suggested, however, it is unclear that the plaintiff in the present case was even required to make such a showing of general intent.

### B. *Intent and the Eighth Amendment*

■ The proper role played by intent in a claimed eighth amendment violation has recently received attention from the courts. Thus, in a setting different from the instant case the Supreme Court has suggested that, in the context of the constitutional amendment, the word "punishment" signifies harm inflicted *purposefully*—generally as part of the criminal sanction. *Bell v. Wolfish*, 441 U.S. 520, 536–540, 99 S.Ct. 1861, 1872–74, 60 L.Ed.2d 447 (1979). Nonetheless, the Ninth Circuit subsequently held that intent to punish is not a necessary component of an eighth amendment claim under section 1983. *Spain v. Procunier*, 600 F.2d 189, 197 (9th Cir. 1979). This seeming inconsistency is readily resolved by examining the cases in the context of the statute and the underlying constitutional claim. Read together, the two cases teach that, at most, what is required in a section 1983 action based on the eighth amendment is that the defendants intended to punish the plaintiff *or* that they caused *another* person intentionally to inflict harm on the plaintiff, and that the harm inflicted was cruel and unusual.

The instant case is an excellent illustration of this point. First, there can be no doubt that the unlawful detention of Frank Haygood at Folsom Prison was "punishment" in the constitutional sense. *Hutto v. Finney*, 437 U.S. 678, 685, 98 S.Ct. 2565, 2570, 57 L.Ed.2d 522 (1978). Obviously, someone was keeping the plaintiff in prison *purposefully* in order to impose what they (wrongly) perceived to be an appropriate criminal sanction. The defendants do not dispute that, to the extent that the plaintiff's incarceration was unwarranted, it was also "cruel and unusual." (See my discussion, *infra*). The necessary conclusion, then, is that the plaintiff was subjected to a deprivation of his rights under the eighth amendment.

Second, assuming the jury predicated its award on eighth amendment grounds, the question of causation was resolved by the jury against these defendants. It was not necessary for the plaintiff to show that these defendants were the persons who subjected him to the deprivation; i.e., that they were the ones who purposefully inflicted harm upon him. "The requisite causal connection can be established not only by some kind of personal participation in the deprivation, but also by setting into motion a series of acts by others which the actor knows or should know would cause others to inflict the constitutional injury." *Johnson v. Duffy*, 588 F.2d at 743–744. I have already discussed the evidence showing that defendants Cranke and Seymour had a duty to determine the plaintiff's release date, and that by failing to execute that duty the defendants caused the plaintiff's continued and illegitimate incarceration. Hence the jury could have found that the defendants, by failing to execute their responsibilities, caused the plaintiff to be subjected to a deprivation of his eighth amendment rights. That is all that is required of plaintiff under this theory of section 1983 liability.[15] Thus, the analysis of the eighth amendment claim (like the fourteenth amendment claim, *supra*), turns wholly on the questions of deprivation and causation. Nonetheless, the defendants maintained and this court accepted that the eighth amendment itself implicates some mental state into the plaintiff's cause of action. My acquiescence in the defendants' request to give the intent instruction rested in part on a hurried reading of *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). A closer examination, however, convinces me that

---

**14.** The meaning of the term "cruel and unusual" as it relates to this case is discussed at length in Part IV, Section C, *infra*.

**15.** As I have already noted, the *Johnson v. Duffy* formulation is another way of expressing

"legal cause." Once a proper instruction is given it is a question of fact for the jury to determine if the circumstances of the case are sufficient to meet the legal standard.

the Supreme Court's holding in *Estelle* did not require the plaintiff in the instant lawsuit to make any showing as to the defendants' states of mind.

### C. *Estelle v. Gamble: The Significance of the Phrase "Cruel and Unusual."*

In *Estelle*, an inmate of the Texas Department of Corrections brought a section 1983 action against, *inter alios*, the Medical Director of the prison in which he was confined. The essence of his complaint against the doctor was that due to the negligence of the doctor and his staff, the prisoner had been given inadequate medical treatment. This alleged professional negligence, the prisoner claimed, constituted cruel and unusual punishment.

The Court traced the evolution of "cruel and unusual punishment" as a constitutional standard, and discussed how that standard had been applied to the medical treatment of prisoners. Even given a liberal reading of the term "cruel and unusual," the Court concluded,

> [m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment.

429 U.S. at 106, 97 S.Ct. at 292.

I have already noted that in this case, unlike *Estelle*, there was evidence that the defendants intended to deprive the plaintiff of his eighth amendment rights. Moreover, in *Estelle*, unlike the instant case, there was no suggestion that the defendant doctor *caused* anyone else to punish the prisoner. Although *Estelle* is thus easily distinguishable from the case at bar, the fact remains that the Supreme Court's opinion has been given a broad reading in regard to the state of mind requirement, and thus merits an examination on its own terms.

*Estelle*, like the present case, involved an eighth amendment claim by a prisoner who alleged that he was injured as a result of an official's breach of duty. The resemblance between the cases is entirely superficial, however, for *Estelle* addressed a very different set of issues than those raised in the present case. The heart of the question in *Estelle* was whether the alleged negligent medical treatment suffered by the prisoner in itself transformed lawful punishment into "cruel and unusual" punishment. The Court held it did not. Medical malpractice, unfortunately, is a risk run by every patient whether the patient is in prison or in a penthouse. The fact that a prisoner must run the same risks as the population at large is not, in the Supreme Court's words, "repugnant to the conscience of mankind." 429 U.S. 106, 97 S.Ct. at 292; *quoting Louisiana ex rel Francis v. Resweber*, 329 U.S. 459, 471, 67 S.Ct. 374, 380, 91 L.Ed. 422 (1947) (Frankfurter, J., concurring). *Estelle* held, in short, that medical malpractice does not *per se* make otherwise legitimate punishment "cruel and unusual." Nonetheless, the Court noted that a prisoner, unlike persons who are free, "must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." 439 U.S. 103, 97 S.Ct. at 290. It is this necessary reliance which in an appropriate case can transmute deliberate indifference (which in the case of a free person would be no more than tortious conduct) into cruel and unusual punishment. Because the state must provide medical care sufficiently adequate to conform to "the evolving standards of decency that mark the progress of a maturing society" (429 U.S. 102, 97 S.Ct. at 290, *quoting Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 596 (1958)), a conscious failure to do so constitutes cruel and unusual punishment. For the same reason "deliberate indifference" must likewise be so condemned. Negligence on the other hand is a risk of treatment all persons suffer in common.[16]

---

16. Under this analysis the hiring of a doctor known to be incapable of maintaining the standard of care might well give rise to a claim under the eighth amendment even if the imme-

Only deliberate indifference to the prisoners' medical needs would put them at a greater risk than they suffer outside and thus only such reckless medical treatment could make otherwise legitimate penal servitude "cruel and unusual."

Some commentators have suggested that *Estelle v. Gamble* is significant only in cases of medical maltreatment of prisoners. *See, e.g.*, Comment, Actionability of Negligence Under § 1983 and the Eighth Amendment, 127 U.Penn Law Review 533, 565–575. Regardless of whether the *Estelle* holding can be extrapolated to situations outside of the medical malpractice context, it clearly does not apply to the case at bar. The harm done to the plaintiff did not result from a risk of everyday life. As I have explained, Frank Haygood's unlawful confinement was punishment, and there was sufficient evidence for the jury to find the defendants in part responsible for its unlawful continuation. The central issue in *Estelle* was whether permissible punishment became "cruel and unusual" by virtue of the doctor's failure to act. That is hardly an issue in this case: there can be little doubt that the punishment endured by this plaintiff, after he should have been released, was "cruel and unusual." In this context, it is not relevant whether *lawful* confinement at Folsom Prison is by nature "cruel and unusual." As the Court said in *Robinson v. California*: "To be sure, imprisonment for ninety days is not, in the abstract, a punishment which is either cruel or unusual. But the question cannot be considered in the abstract. Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." 370 U.S. 660, 667, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962). Once Frank Haygood served the sentence imposed by law, he had as much right to be free as any other person; he was no longer being punished for any crime

whatsoever. The jury could have concluded that the long months of unsanctioned confinement suffered by this plaintiff constituted "cruel and unusual punishment," regardless of what the defendants intended. Once again, there was sufficient evidence of the defendants' intent. Moreover, to the extent that the defendants caused such an injury to the plaintiff, they were liable to him under section 1983.

## V

### THE AFFIRMATIVE DEFENSE OF GOOD FAITH AND REASONABLENESS

In the foregoing analysis I have emphasized that neither section 1983 nor the underlying constitutional claims requires any showing by the plaintiff regarding these defendants' states of mind. By its terms, then, the statute makes these defendants subject to liability regardless of fault for any actions or omissions so long as they have caused injury to the plaintiff's protected interests. The courts, however, have held that it would be neither fair nor sound social policy to subject public officials to strict liability under section 1983. Accordingly, the Supreme Court has announced a qualified immunity from liability damages in section 1983 actions. *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). This qualified immunity was extended to prison officials in *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978).

The immunity is properly characterized as an affirmative defense (*Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980)); accordingly, as the defendants concede, they bore the burden of proof on this issue.[17] While a

---

diate cause of injury was that doctor's mere negligence.

17. As I have pointed out in another context, the unfortunate phrase "burden of proof" has two distinct and oft-confused meanings. *Kouba,* n.1, *supra,* at 153. It may indicate who bears the burden of persuading the jury as to a given

issue, or it may simply refer to a party's duty to produce enough evidence to make a prima facie showing. The reasoning in *Gomez* suggests that a defendant to a section 1983 suit bears both burdens when presenting an affirmative defense of good faith and reasonable conduct. The holding in *Gomez,* however, only reached the issue of the burden of production. (Justice

judgment notwithstanding the verdict may be granted for a party bearing the burden of proof, the standard is somewhat recast: The court must conclude "that as a matter of law the evidence was capable of only one interpretation." *Juhnke v. EIG Corp.*, 444 F.2d 1323, 1325 (9th Cir. 1971). Thus such a motion should be granted "[o]nly in an exceptional case." *Id.; see also* Wright & Miller, *Federal Practice and Procedure*: Civil § 2535 (1971).

Granting the defendants' motion in the instant case would signify that the only conclusions that could be drawn from the evidence are: (1) that the defendants acted entirely in good faith, and (2) that the defendants *reasonably* believed that the action they took was appropriate. *Procunier v. Navarette, supra*, 434 U.S. at 562, 98 S.Ct. at 859; *Scheuer v. Rhodes, supra*, 416 U.S. at 247–48, 94 S.Ct. at 1691–92. The defendants argue that they harbored no ill-will towards the plaintiff, and that the "good-faith" prong of the test is made. Assuming arguendo that the evidence on ill-will is conclusive, I cannot agree, however, that as a matter of law the defendants acted reasonably when they responded to the plaintiff's inquiries. There is evidence that the defendants made only a cursory check of the plaintiff's records; their written responses to him were terse and oblique. They undertook no further investigation, nor did they seek to institute a hearing or other administrative procedure to determine if the plaintiff should have been released. The jury, after evaluating this evidence, could reasonably have decided that the defendants' conduct was not reasonable under the circumstances.

The defendants refer to the testimony of one of their colleagues who said, in effect, that no records officer would have done more than the defendants did. Such evidence, even if believed, raises at best an inference that what the defendants had done was reasonable; the jury was free to come to the opposite conclusion. In the words of Mr. Justice Holmes: "What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not." *Texas & Pacific Railway Co. v. Behymer*, 189 U.S. 468, 470, 23 S.Ct. 622, 47 L.Ed. 905 (1903).

Similarly, the defendants make much of the fact that it was not until a year and a half after they wrote to Mr. Haygood that the California Supreme Court decided that the plaintiff was being held unlawfully. Certainly, if the defendants' responses had come after the issue had been adjudicated, they would have been foreclosed by law from asserting this defense. *Wood v. Strickland, supra*, 420 U.S. at 322, 95 S.Ct. at 1000; *Johnson v. Duffy, supra*, 588 F.2d at 745. The fact that the defendants are not negligent as a matter of law, though, does not mean that they acted reasonably. This is not a case where the defendants were "charged with predicting the future course of constitutional law." *Pierson v. Ray*, 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967); *see also Benson v. Hightower*, 633 F.2d 869 (9th Cir. 1980). Rather, the plaintiff presented credible evidence that the defendants, after being put on notice, simply refused to investigate a computational error. In like fashion defendants' reliance on the Attorney General's opinion is of no avail. As defendants themselves repeatedly argued during the course of the trial, it was not the application of the "continuous term" policy to plaintiff's case which caused the harm, but the failure to perceive which of two terms preceded the other. The Attorney General's opinion dealt only with the continuous

Rehnquist wrote a brief concurrence specifically to emphasize that fact.) The better view is that the section 1983 defendant has both the burden of pleading and of proving his or her qualified immunity. *See* Nahmod, *Civil Rights and Civil Liberties Litigation*: § 8.13 (1979, with 1981 supplement), and cases cited therein. In the instant case, the defendants have conceded in their briefs to the court that they bore the burden of persuasion as to this defense. Moreover, on the basis of the evidence presented, the defendants would not be entitled to judgment notwithstanding the evidence even if they did not bear the burden of persuasion as to this issue.

term policy and thus was wholly irrelevant to plaintiff's plight.

The question of the reasonableness of the defendants' conduct was a matter for the jury to decide. There was ample evidence for the jury to conclude that the defendants did not act in a reasonable and prudent manner given the totality of the circumstances. Among those circumstances was the fact that another person's freedom hung in the balance.

## VI

### CONCLUSION

The plaintiff presented sufficient evidence for the jury to conclude that defendants Cranke and Seymour caused the plaintiff to be subjected to a deprivation of the rights guaranteed him by the fourteenth amendment to the Constitution. Frank Haygood's confinement at Folsom Prison, after he had completed the sentence imposed upon him, constituted a deprivation of liberty without due process of law, and could be viewed as cruel and unusual punishment. The defendants acted under color of state law, and the jury could reasonably have concluded that the acts or omissions of the two officials caused the deprivation of the plaintiff's rights during the last seventeen months of his confinement. Thus the plaintiff fulfilled all the requirements for a section 1983 action brought to vindicate his rights under the eighth amendment and the Due Process Clause of the fourteenth amendment. The plaintiff's evidence was not insufficient for failure to prove the defendants' intent, for no such state of mind showing is required.

The defendants did have an opportunity to demonstrate that they acted reasonably and in good faith, and thus argue that they were not liable. The evidence presented, however, did not preclude the jury from finding that the defendants acted unreasonably, and were not immune from damages.

For the reasons stated, the defendants' motion for judgment notwithstanding the verdict is denied.

IT IS SO ORDERED.