Frank HAYGOOD, Plaintiff-Appellee,

v.

Evelle J. YOUNGER, etc., Defendants,

and

Harold Cranke and Benjamin Seymour, Defendants-Appellants.

No. 81–4686.

United States Court of Appeals, Ninth Circuit.

Oct. 25, 1983.

William George Prahl, Deputy Atty. Gen., Sacramento, Cal., for defendants-appellants.

Jack Jacobson, Santa Cruz, Cal., for plaintiff-appellee.

Before WISDOM *, SNEED and FAR-RIS, Circuit Judges.

SNEED, Circuit Judge:

Harold Cranke and Benjamin Seymour, records officers at Folsom State Prison and the California Department of Corrections, respectively, appeal from the district court's denial of their motion for judgment notwithstanding the verdict in a section 1983 action. Frank Haygood alleged that Cranke and Seymour violated his due proc-ess and Eighth Amendment rights by improperly investigating his legal status while he was incarcerated pursuant to a series of concurrent and consecutive sentences. He contended that their conduct resulted in his unlawful confinement beyond the actual term of those sentences. The jury returned a general verdict of $2,090 in damages. Cranke and Seymour also appeal the award of $45,383 in attorney's fees. We reverse and remand.

## I.

### FACTS

The decision of the California Supreme Court, which appears in part in the margin, granting Haygood's habeas corpus petition provides the background facts leading to his release.[1] *See In re Haygood,* 14 Cal.3d 802,

---

* Honorable John Minor Wisdom, Senior Circuit Judge for the United States Court of Appeals for the Fifth Circuit, sitting by designation.

1. WRIGHT, Chief Justice.

We issued an order to show cause in response to a petition for writ of habeas corpus prepared in propria persona by Frank Haygood, an inmate of the California State Prison at Folsom, alleging that the Department of Corrections and the Adult Authority had acted unlawfully in refixing certain of the terms to which he has been sentenced and in revoking credit for time served on another. Counsel was appointed for petitioner. His review of conviction and sentencing data relative to petitioner's confinement led him to conclude that additional issues should be raised on petitioner's behalf. By leave of the court a supplemental petition was filed and respondent Department of Corrections has replied to both the original and supplemental petitions, which we shall hereinafter refer to in the singular as the petition. We have concluded, based on the undisputed facts set out in the petition and the return thereto, that petitioner's terms as fixed by the Adult Authority (Authority) had been fully served prior to the date upon which the Authority last purported to extend them, and that notwithstanding any erroneous legal conclusions that may have influenced the Authority when it fixed those terms, petitioner is entitled to be discharged.

In 1946 petitioner was convicted of escape in violation of Penal Code Section 4530. He was sentenced to the term prescribed by law which was then a term of imprisonment not exceeding 10 years. It is undisputed that petitioner was discharged from this "original" term on June 29, 1953.

On March 24, 1949, petitioner was convicted of five counts of forgery in violation of section 470. He was sentenced to concurrent terms of 1 to 14 years' imprisonment. These "A" terms were concurrent with the "O" (original) term and commenced on April 1, 1949, when petitioner was delivered to the custody of the Department of Corrections.

On April 23, 1956, petitioner was convicted of carrying a concealed weapon in violation of section 12021. The offense was committed while petitioner was serving his "A" terms on parole. He was sentenced to a term not exceeding five years. This "B" term, which was concurrent with the "A" terms, commenced April 25, 1956. Although its records reflect no discharge from the "A" and "B" terms, but instead indicate service of more than 23 years on the 14-year maximum "A" terms and 18 years on the 5-year maximum "B" term, before this court respondent concedes that the maximum duration of the "A" and "B" terms was approximately April 1963 and May 1961, respectively. The Department of Corrections and the Adult Authority should, therefore, correct their records accordingly to reflect petitioner's discharge from the "A" and "B" terms.

On or about December 21, 1958, however, while he was still serving the "A" and "B" terms, petitioner escaped from a prison camp and shortly thereafter participated in a robbery. He was prosecuted first for the robbery and on January 5, 1959, was convicted and sentenced to a term of not less than one year for violation of section 211. This "C" term, which was concurrent with the then uncompleted "A" and "B" terms, commenced January 8, 1959.

Petitioner then pleaded guilty to escape in violation of section 4531, which has since

122 Cal.Rptr. 760, 537 P.2d 880 (1975). 1958 is a good year in which to commence the recital of facts particularly relevant to this case. Haygood escaped in that year from a prison camp while serving concurrent sentences previously designated as his "A" and "B" terms. While at large he committed a robbery, for which he received a sentence designated his "C" term. Subsequently he was convicted of the escape, for which he received a sentence designated his "D" term. Upon his return to prison, the Department of Corrections and the California Adult Authority treated his "D" term for escape as consecutive not only to his "A" and "B" terms, which he had been serving when he escaped, but also the "C" term imposed for the robbery he committed *after* escaping. *Id.* at 806–07, 122 Cal.Rptr. at 762–63, 537 P.2d at 882–83.

On October 8, 1970, the Adult Authority granted Haygood a parole date of December 14, 1970. Had Haygood not violated his parole all terms would have been discharged on July 8, 1974. His "C" term was

been repealed. Two prior convictions charged in the information—the 1949 forgery and the 1956 concealed weapon convictions—were stricken prior to the plea. He was sentenced on April 14, 1959.

In sentencing petitioner for the escape the court orally recited that "he be committed to the state prison for the term prescribed by law, the sentence to run at the time he would otherwise have been discharged." The abstract of judgment, which erroneously included the stricken prior convictions, properly reflected the oral pronouncement of judgment. After printed language which read, "It is ordered that the sentences shall be served in respect to one another as follows," a section intended to apply only to sentences on multiple counts in the same judgment, the following typewritten entry appears: "Sentence to commence at the time said defendant would otherwise have been discharged." Following the printed entry "and in respect to any prior incompleted sentence(s) as follows" a typewritten entry states, "Same as above." The instructions on the printed form direct the court to enter there its ruling on whether the new term is to be "concurrent or consecutive to all incomplete sentences from other jurisdictions." Notwithstanding the sentencing judge's use of the statutory language of section 4531 that the term commence when petitioner "would otherwise have been discharged" from the terms he was serving at the time of the escape, i.e., the "A" and "B" terms, the Department of Corrections and the Adult Authority treated the escape term as consecutive not only to the "A" and "B" terms that petitioner was serving at the time of his escape, but also to the "C" term for the robbery he committed *after* the escape.

On October 8, 1970, after petitioner had served the maximum permissible number of years on the "A" and "B" terms, the Adult Authority fixed petitioner's "C" term at 10 years, and entered on its records an "administrative" discharge of the "C" term retroactive to January 8, 1969, the date upon which he had completed service of 10 years on that term. At the same time the Authority fixed petitioner's "D" term at five and one-half years with a discharge date of July 8, 1974, and set a parole date of December 14, 1970. The Authority intended by this order to cause the "D" term to commence retroactively as of January 8, 1969, the date of the discharge from the "C" term.

The Authority suspended petitioner's parole on January 7, 1972. By operation of Adult Authority policies then in effect, that suspension automatically caused any incompleted terms to be refixed at maximum. On March 14, 1972, in conjunction with the formal revocation of parole, the Authority again fixed the "C" term at 10 years, and this time fixed the "D" term at 6 years with a January 8, 1975, expiration date. Petitioner was again released on parole, but on April 27, 1973, his parole was suspended, again causing his terms to be refixed at maximum. On December 13, 1973, parole was formally revoked. His terms have not been refixed at less than maximum since that date. Although petitioner had served the period from January 8, 1969, to April 27, 1973, on his "D" term, the effect of refixing his "C" term at the life maximum, according to respondent, was to deny him any credit on the "D" term because that term could not commence until his discharge from the "C" term. Therefore, although 16 years have passed since petitioner was sentenced on the escape conviction, and even though he had once been given credit for service of over 4 years on that term, respondent now considers him to be serving only the "C" or robbery term. According to respondent, his "D" or escape term has not commenced. Thus petitioner, having once reached the goal of "administrative discharge" from his "C" term, and having embarked on service of his "D" term, like Sisyphus finds himself back again at the beginning, destined to endlessly repeat his own odyssey through the term-fixing process.

*In Re Haygood,* 14 Cal.3d at 804–08, 122 Cal. Rptr. at 761–64, 537 P.2d at 881–884 (footnotes omitted).

also fixed by the Adult Authority at ten years and his "D" term at five-and-one-half years resulting in a final discharge date of July 8, 1974, on all his terms. Because the October 8 action fixed the "C" term at less than the time already served, Haygood received an "administrative discharge" for that term retroactive to January 8, 1969, the date upon which he had served ten years on the term. The Adult Authority intended by this order to cause the "D" term to commence retroactively as of that date. *Id.* at 807, 122 Cal.Rptr. at 763, 537 P.2d at 883. Although plaintiff's prison records indicated that he had completed the maximum possible sentence on his "A" and "B" terms as of 1963 and 1961, respectively, the Adult Authority continued to refer to those terms in accordance with the "continuous term policy." That policy provided that when a prisoner receives a sentence which is to run consecutively to another term, no single term is discharged until all are. Each consecutive sentence was regarded as but a segment of a single continuous term.

Haygood, following his release on parole, violated his parole and was returned to prison. Again he was released and again he returned. At that time, December 13, 1973, the Authority, after finally revoking his parole, purported to refix his "C" and "D" terms at their maximum of life imprisonment. *Id.* at 807–08, 122 Cal.Rptr. at 763–64, 537 P.2d at 883–84.

Thereafter Haygood received a form from the Adult Authority notifying him of his legal status. At trial he testified that he thought the form indicated that he was still serving time on his "A" and "B" terms as well as his "C" term and that he had not been credited with having served any time on his "D" term. A correctional counselor at Folsom State Prison met with Haygood on at least five occasions to discuss these concerns. The counselor also discussed them with defendant Cranke, a Records Officer II at Folsom State Prison. Haygood later wrote to Cranke regarding his sentences. After reading the letter, Cranke reviewed Haygood's central file, which included his legal status form, the cumulative case summary, the abstracts of judgment,

and materials from the sentencing proceedings. Cranke answered Haygood's concerns about his sentence by referring him to the continuous term policy set forth in two California Attorney General's opinions.

A short time later Haygood wrote a letter to the Administrative Officer of the Adult Authority, who, without acting, passed the letter on to defendant Benjamin Seymour, a Records Officer III for the Department of Corrections. Seymour reviewed Haygood's central file and pertinent Attorney General's opinions and spoke with Cranke to confirm Haygood's legal status. On April 1, 1974, Seymour sent a letter to Haygood responding to his questions.

Dissatisfied with these responses, Haygood filed a pro per petition for a writ of habeas corpus in the California Supreme Court. *Id.* at 804–05, 122 Cal.Rptr. at 761, 537 P.2d at 881. In accord with the objections he had expressed in his letters, Haygood alleged that the Department of Corrections and the Adult Authority "had acted unlawfully in refixing certain of [his] terms . . . and in revoking credit for time served on another." *Id.* at 805, 122 Cal. Rptr. at 761, 537 P.2d at 881.

Counsel for Haygood was appointed and in a supplemental petition prepared by counsel it was alleged that the order of the sentencing judge on his 1959 escape conviction "did not purport to make the 'D' term consecutive to the 'C' term, and that even had the judge attempted to order that the 'D' term be consecutive to the 'C' term, he lacked authority to do so." *Id.* at 808, 122 Cal.Rptr. at 764, 537 P.2d at 884. A fellow prisoner who had aided Haygood in composing his numerous letters to prison authorities conceded at the section 1983 trial that neither he nor Haygood had had this theory in mind prior to appointed counsel's preparation of the supplemental petition.

The California Supreme Court by a six to one majority found the argument raised by supplemental petition dispositive. It held that the Department of Corrections and the Adult Authority had erroneously treated the "D" term as consecutive to the "C" term by misinterpreting the 1959 escape

judgment. Haygood's terms had therefore effectively terminated no later than October 8, 1970, the date of the administrative action fixing his terms. Thus, the Adult Authority had no power to refix terms which he had already irrevocably discharged. The court ordered him released.

To this point this case presents nothing very unusual. The Adult Authority under California's then indeterminate sentencing procedures, which were in effect until 1976–77, miscalculated the release date of a recidivist prisoner. This mistake was corrected by the California Supreme Court as a result of Haygood's utilization of California's habeas corpus procedures. A wrong done by officials of California was corrected by California courts.

This case commences to take on its present form when Haygood alleged in this section 1983 action that he had been deprived of his right to liberty without due process of law and that he had been subjected to cruel and unusual punishment contrary to the Eighth Amendment as incorporated into the Fourteenth Amendment. The Attorney General of the State of California, the Director of the California Department of Corrections, members of the California Adult Authority, the Administrative Officer for the Adult Authority, and four prison officials, including Cranke and Seymour, were named as defendants.

On April 13, 1976, the district court dismissed the complaint as to the Attorney General and the Adult Authority members on the ground that they were absolutely immune. On January 5, 1978, the court dismissed the Director insofar as the complaint sought damages. On March 21, 1978, the court dismissed the complaint as to all defendants insofar as it sought declaratory relief. On the third day of trial, the court granted the motion for directed verdict as to two of the prison officials and the Administrative Officer for the Adult Authority, but denied it as to Cranke and Seymour, the remaining defendants. The jury returned a general verdict against Cranke for $640 and against Seymour for $1,450. The trial court denied their motion for judgment notwithstanding the verdict. *See*

*Haygood v. Younger,* 527 F.Supp. 808 (E.D. Cal.1981).

We have disposed of Haygood's appeals from the pretrial dismissals by unpublished memorandum order. This appeal concerns only the propriety of the trial court's denial of the motion for judgment notwithstanding the verdict.

Cranke and Seymour contend that the district court erred in seven different ways. These are:

1. By ruling that simple negligence can support a cause of action under section 1983 founded on deprivation of due process and Eighth Amendment rights;

2. By holding that the availability of a tort remedy under California law did not provide Haygood due process so as to preclude his section 1983 suit;

3. By finding the evidence introduced at trial sufficient to support the jury verdict;

4. By denying their motion for directed verdict based on a good faith defense;

5. By awarding Haygood attorney's fees under section 1988;

6. By denying discovery and an evidentiary hearing on the issue of the reasonableness of Haygood's attorney's fees; and

7. By awarding attorney's fees which were grossly disproportionate to Haygood's recovery.

The first, second, and seventh assigned errors present legal issues, the third and fourth go to the sufficiency of the evidence, and the fifth and sixth raise issues that pertain to the manner in which the trial court exercised its discretion. Our disposition turns on legal issues reasonably embraced by appellant's first two assigned errors. As a consequence, our review is de novo.

The approach we employ best can be understood by setting forth the main points of the district court's analysis of this case which appears in its published opinion. *See Haygood v. Younger,* 527 F.Supp. 808 (E.D. Cal.1981). The district court held, first,

that the plaintiff was improperly deprived of his liberty; second, that this deprivation was done under "color of state law"; third, that 42 U.S.C. § 1983 requires no particular state of mind on the defendant's part; fourth, that post-deprivation processes in the case of a deprivation of liberty can never provide the "due process" required by the Fourteenth Amendment because money damages can never restore previously lost liberty; fifth, that plaintiff's incarceration beyond the expiration of his term even for one day was "cruel and unusual punishment" within the meaning of the Eighth Amendment; sixth, that, inasmuch as no particular state of mind is required by section 1983, the charge to the jury that to find for the plaintiff it must find that the defendants "by their actions intended to punish plaintiff and that this punishment violated the basic prohibition against inhuman treatment," was more favorable to the defendants than the law required; and, finally, that the jury could reasonably conclude that the defendants failed to establish that they acted entirely in good faith and that their belief in the correctness of their actions was reasonable.

We readily agree with the district court's first two points and are prepared to assume, *arguendo,* that the third is also correct with respect to section 1983 suits alleging deprivations of liberty or property without the due process required by the Fourteenth Amendment. We reject the third point to the extent it relates to suits alleging Eighth Amendment violations as our discussion below will indicate. We disagree, moreover, with the fourth, fifth, and sixth points of the district court. We hold, accordingly, that post-deprivation processes can provide the "due process" required by the Fourteenth Amendment and that Haygood's incarceration beyond the expiration of its term even for one day was not *ipso facto* "cruel and unusual punishment" within the meaning of the Eighth Amendment. Because the district court's approach to the trial of this case was thoroughly infused with its fourth, fifth, and sixth points, our disagreement with these positions, as well as our limited disagreement with the third, requires that we reverse the judgment of

the district court in its entirety. Pursuant to the provisions of Rule 50(d), F.R.Civ.P., we remand for a new trial.

## II.

## DEPRIVATION OF LIBERTY AND POST–DEPRIVATION DUE PROCESS

### A.

In *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), the Supreme Court indicated that negligence might suffice to support a section 1983 cause of action. It did this most strongly by its observation that "[b]oth *Baker v. McCollan* [443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)] and *Monroe v. Pape* [365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)] suggest that § 1983 affords a 'civil remedy' for deprivations of federally protected rights caused by persons acting under color of state law without any express requirement of a particular state of mind." 451 U.S. at 535, 101 S.Ct. at 1912. The proposition was not essential to the decision. Justice Powell, believing that the Court had decided this threshold question without squarely addressing it, concurred only in the result. 451 U.S. at 546, 101 S.Ct. at 1918; *see also id.* at 554, 101 S.Ct. at 1917 (Marshall, J., concurring in part and dissenting in part). Nonetheless, we have previously read *Parratt* to hold that negligence alone can support a section 1983 cause of action. *See Hirst v. Gertzen,* 676 F.2d 1252, 1262–63 (9th Cir.1982); *accord Fernandez v. Chardon,* 681 F.2d 42, 55 (1st Cir.1982), *cert. denied in part,* —— U.S. ——, 103 S.Ct. 343, 74 L.Ed.2d 384 (1982), *aff'd on other grounds sub nom. Chardon v. Soto,* —— U.S. ——, 103 S.Ct. 2611, 77 L.Ed.2d 74 (1983); *Mills v. Smith,* 656 F.2d 337, 340 n. 2 (8th Cir.1981). *Contra Price v. Baker,* 693 F.2d 952, 953 (10th Cir.1982) (notwithstanding *Parratt,* "uncertainty whether negligence will support a § 1983 action").

■ Recognition that a section 1983 action can rest on negligent conduct pushes to the forefront the issue whether post-depri-

vation process can satisfy the Fourteenth Amendment requirement of due process. A pre-deprivation hearing is not feasible with respect to a deprivation caused by negligence. *Parratt v. Taylor* resolved the issue affirmatively by holding that the state tort remedies for wrongful deprivation of a prisoner's property satisfied the due process requirement.

*Parratt v. Taylor,* however, involved a deprivation of property—not liberty. Courts are divided on the question whether *Parratt* applies to deprivations of liberty interests. *Compare Daniels v. Williams,* 720 F.2d 792 (4th Cir.1983) (*Parratt* applies to some deprivations of non-property interests including negligent deprivation of liberty interests); *Wolf-Lillie v. Sonquist,* 699 F.2d 864, 871 (7th Cir.1983) (*Parratt* "requires federal courts to consider the adequacy and availability of remedies under state law before concluding that a deprivation of life, liberty, or property violates due process of law"); *Ellis v. Hamilton,* 669 F.2d 510, 515 (7th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982); *Juncker v. Tinney,* 549 F.Supp. 574, 576–79 (D.Md.1982), *with Brewer v. Blackwell,* 692 F.2d 387, 394–95 (5th Cir.1982) (*Parratt* does not apply to deprivations of liberty). The issue is unsettled in this circuit. *Compare Rutledge v. Arizona Board of Regents,* 660 F.2d 1345, 1352 (9th Cir. 1981) (*Parratt* applies; no due process violation; section 1983 cause of action unavailable), *aff'd on other grounds sub nom. Kush v. Rutledge,* —— U.S. ——, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983), *with Wakinekona v. Olim,* 664 F.2d 708, 715 (9th Cir.1981) (*Parratt* does not apply; due process violation; section 1983 cause of action available), *rev'd on other grounds,* —— U.S. ——, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983).

In refusing to apply *Parratt,* the *Wakinekona* court pointed out that Justice Blackmun's concurrence, which Justice White endorsed, limited the case to property interests. 664 F.2d at 715; *see* 451 U.S. at 545, 101 S.Ct. at 1917. However, such a limitation appeared neither in the Court's opinion, which commanded five votes in addition to those of Justices White and Blackmun, nor in the concurrence of Justice Stewart, one of those who joined the majority. Moreover, Justice Blackmun provided no rationale for the limitation he suggested. Nor did the *Wakinekona* court, which simply pronounced that cases "dealing with a liberty interest [are] of a wholly different nature" than those involving property. 664 F.2d at 715.

The Fifth Circuit in *Brewer,* which also refused to apply *Parratt* to liberty interests, relied on the narrow reading given that case by the Court in *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 435–37, 102 S.Ct. 1148, 1156–58, 71 L.Ed.2d 265 (1982), as well as on the citation in *Logan* to Justice Blackmun's concurrence in *Parratt.* 692 F.2d at 394–95; *see* 455 U.S. at 436, 102 S.Ct. at 1158. *Logan,* however, presents an issue different from that involved here. A charge with the Illinois Fair Employment Practices Commission was filed by Logan alleging that his employer had wrongfully discharged him because of physical handicap. At the time, the Illinois fair employment statute required that the Commission hold a factfinding conference within 120 days, which it failed to do for reasons beyond Logan's and his employer's control. The Illinois Supreme Court held that the Commission's failure to convene in a timely manner the statutorily mandated conference deprived the Commission of jurisdiction and extinguished Logan's cause of action. It rejected his due process and equal protection arguments, finding that the procedures established by the statute were reasonable.

The Supreme Court reversed. It concluded that due process required that:

> [T]he Commission consider the merits of [Logan's] charge, based upon the substantiality of the available evidence, before deciding whether to terminate his claim.... A system or procedure that deprives persons of their claims in a random manner, as is apparently true of [the Illinois statute], necessarily presents an unjustifiably high risk that meritorious claims will be terminated.

455 U.S. at 434–35, 102 S.Ct. at 1157. The *Logan* Court distinguished *Parratt* because Logan challenged "the 'established state procedure' that destroys his entitlement

without according him proper procedural safeguards." *Id.* at 436, 102 S.Ct. at 1158. Logan complained about a systemic procedural deficiency, not about an unexpected or random error. While the Court cited Justice Blackmun's concurrence in *Parratt* to support its position, nothing in the holding or analysis of *Logan* required the Court to undermine *Parratt.*

Whether a process statutorily provided for a certain purpose satisfies the Fourteenth Amendment's due process requirement is one issue. Whether, following a deprivation of liberty for which a pre-deprivation hearing would not be feasible, the post-deprivation process *can* satisfy the Fourteenth Amendment is another. And if this question is answered affirmatively, a third issue is whether the available post-deprivation process *does* satisfy the Fourteenth Amendment. *Logan* is concerned only with the first issue; in this case we are concerned with the second and third. It is true that the first and the third resemble each other. However, the first is concerned with pre-deprivation situations while the third only arises when pre-deprivation processes are not feasible.

Thus, the *Logan* Court found the state system unconstitutional. The statute was deficient because it provided inadequate pre-deprivation process under circumstances in which such process was feasible. It provides no guidance with respect to situations in which pre-deprivation process is not feasible.

■ The district court here refused to apply *Parratt*'s reasoning to liberty interests because it believed that to do so would revive the requirement, rejected at least since *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), that a section 1983 plaintiff must first exhaust state remedies. *See* 527 F.Supp. at 815; *cf. Patsy v. Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) (exhaustion of state administrative remedies is not a prerequisite to a section 1983 action). We disagree. This objection amounts to a rejection of the reasoning of *Parratt;* it has no greater force with regard to a liberty interest than to a property interest. It misperceives *Parratt*'s import by confusing the

rights accorded by the Fourteenth Amendment's due process clause with the remedy afforded by section 1983. *Parratt* did not deny Taylor a remedy; it defined his rights. The decision does not require that state remedies be exhausted. It held that no constitutional violation occurred. Resort to federal court in situations encompassed by its rationale is foreclosed. *See Ellis,* 669 F.2d at 515; *Juncker,* 549 F.Supp. at 578. And for that matter, so is recourse to state courts on a section 1983 claim.

■ We hold, therefore, that *Parratt* applies to situations in which process prior to deprivation of liberty would not be feasible or practicable. It is the adequacy of the state post-deprivation process that is properly at issue once it is clear that pre-deprivation process was neither feasible nor practicable. The distinction between deprivations of property and those of liberty in that context is unimportant.

The district court obviously did not embrace this position. It focused first on the rights guaranteed Haygood rather than the remedies available to him. 527 F.Supp. at 814. It reasoned that since the state had lawfully confined Haygood after conducting a hearing, "he had a correlative due process right to be released from prison when his lawfully fixed term of imprisonment expired." *Id.* Thus, it concluded, "the process to which Mr. Haygood was entitled was to have his liberty restored to him at the precise moment fixed by state law." *Id.*

■ This analysis is fatally flawed. It makes the deprivation itself a denial of due process. That amounts to saying that a deprivation of liberty, i.e., a wrongful incarceration, is a violation of the Fourteenth Amendment without regard to whether the available process was adequate or inadequate, pre-deprivation or post-deprivation. That is not the law. The Fourteenth Amendment protects only against deprivations without due process of law. *See Parratt,* 451 U.S. at 537, 101 S.Ct. at 1914; *Baker,* 443 U.S. at 145, 99 S.Ct. at 2695. Section 1983 does not provide a cause of action for every wrongful or improper deprivation of either liberty or property by a

state without regard to the process by which it is accomplished. It is not an insurance policy against mistakes being made by those acting under the color of state law. It only insures against mistakes made in the absence of "due process."

██ The district court found *Parratt* inapplicable in part because of its belief that no process could be "due" inasmuch as money damages can never adequately compensate for a deprivation of liberty. It is true that money cannot restore even a moment of the past. However, that is true without regard to whether Haygood has a cause of action under section 1983 or not. The inability of money to restore liberty previously lost is simply irrelevant to whether *Parratt* is applicable to deprivations of liberty.

### B.

██ It remains for us to determine whether the process accorded Haygood meets the constitutional standard of "due process." Haygood was accorded substantial, but as it turned out not mistake free, "process" commencing shortly after the date on which it was later determined that he should have been released. On October 8, 1970, the Adult Authority fixed both his "C" and "D" terms and a parole date of December 14, 1970. As already pointed out, had plaintiff not violated his parole all terms would have been discharged on July 8, 1974. However, twice his parole was suspended and finally revoked on December 13, 1973. Thereafter commenced the plaintiff's encounters with the defendants and others in which he insisted that he, in some fashion or other, was being required to serve more time than his sentences required. This, too, was a part of the "process" afforded the plaintiff by the State of California. Additional "process" was afforded by way of the habeas corpus proceedings which, unlike other "process" to which plaintiff enjoyed access, achieved the end he sought—his release from prison. Finally, a remedy under state tort law existed of which Haygood failed to take advantage.

We hold this array of "processes" is sufficient to meet the constitutional requirement. Under the facts of this case, the distinction between pre- and post-depriva-

tion process does not loom as large as it might. Process commenced after the expiration of the "A" and "B" terms, *viz.*, October 8, 1970, and before the "C" term was fixed, which term after being so fixed was retroactively treated as discharged as of January 8, 1969. We know not what the Adult Authority would have done had it not believed that the "D" term had not been served. Arguably "process" can be said to have commenced before the deprivation of liberty and continued thereafter. In any event it was a continuous process that was responsive to the rules of the Adult Authority as the officials then understood them, as well as to Haygood's complaints. When this is realized the true nature of this case becomes clear. It is simply an instance in which the proper authorities understood the California law of indeterminate sentences in a fashion subsequently determined to be incorrect by the Supreme Court of California on a six to one vote. No liberty interest of the defendant was stripped from him without due process. All available process, both before and after the deprivation of liberty, was accorded Haygood. That which was utilized post-deprivation was not feasible before deprivation. That the process was lengthy does not in this setting make it constitutionally inadequate. Neither does the fact that only the state court of last resort set matters aright. Arguing that processes that ultimately vindicated the claim asserted are constitutionally deficient is surprising, if not perverse.

### III.

### EIGHTH AMENDMENT

As already indicated we reject the district court's view that a single day's incarceration beyond a prisoner's lawful term is "cruel and unusual punishment" within the meaning of the Eighth Amendment. Our approach to the Eighth Amendment issue rests on four separate but interrelated propositions:

(1) Detention of the plaintiff beyond the termination of the sentence under the facts of this case was punishment within the constitutional sense of the term. *See Bell v. Wolfish*, 441 U.S. 520, 535–40, 99 S.Ct. 1861, 1871–74, 60 L.Ed.2d 447 (1979).

(2) Punishment to be cruel and unusual, that is to be incompatible with "the evolving standards of decency that mark the progress of a maturing society," *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958), must involve an unnecessary and wanton infliction of pain or be grossly disproportionate to the severity of the crime. *See Solem v. Helm,* —— U.S. ——, 103 S.Ct. 3001, 3006, 77 L.Ed.2d 637 (1983); *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981); *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976).

(3) Detention beyond the termination of the sentence constitutes cruel and unusual punishment when it results from "deliberate indifference" to the prisoner's interest in liberty. *See Estelle v. Gamble,* 429 U.S. at 104, 104–06, 97 S.Ct. at 291–92.

(4) Detention beyond the termination of the sentence that is not the result of "deliberate indifference" must be measured against the Due Process Clause of the Fourteenth Amendment. *Cf. City of Revere v. Massachusetts General Hospital,* —— U.S. ——, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983) (where Eighth Amendment rights are not violated, Due Process Clause governs alleged deprivations of liberty); *Bell v. Wolfish,* 441 U.S. at 535 n. 16, 99 S.Ct. at 1871 n. 16 (the Due Process Clause, rather than the Eighth Amendment, governs the rights of pretrial detainees).

From these propositions it follows that the district court erred in its fifth and sixth holdings and that it improperly instructed the jury with respect to the alleged Eighth Amendment violations. The authority for these propositions is indicated therein.

Admittedly, suits seeking damages for post-sentence-termination detention are

rare, and legal authority sparse. One case has been found subjecting such detention to due process analysis, *Douthit v. Jones,* 619 F.2d 527 (5th Cir.1980), but none subjecting it either to automatic Eighth Amendment proscription or to Eighth Amendment scrutiny. It appears to be a novel issue. Evidence of its novelty can be demonstrated by making the assertion that those whose convictions are overturned by post-conviction remedies may have a section 1983 cause of action against the convicting state or a *Bivens*-type cause of action against the convicting United States. The books presently contain few if any cases making this assertion.

█ The foundation on which the above propositions rest is that not all improper punishment is cruel and unusual. That being so, the issues this case presents are whether Haygood's post-sentence-termination detention was (1) cruel or unusual, or (2) in violation of the Due Process Clause of the Fourteenth Amendment. The first must be resolved negatively if the improper punishment was not imposed as a result of "deliberate indifference" and similarly must the second if the "process" available meets, as we have held it does in this case, the constitutional standard of "due." Because the district court did not approach the case in this fashion we reverse and remand for a new trial.

█ Our major difference with the district court in the Eighth Amendment area is that, unlike the district court, we find that "cruel and unusual" requires a degree of culpability on the part of state officials. Cases arising from analogous situations support this approach by employing the "deliberate indifference" standard.[2] To treat as "cruel and unusual" incarceration even for a moment without regard to the fault of those responsible is to drain "cruel and unusual" of its fault content and to

---

2. *See e.g., Wright v. Wagner,* 641 F.2d 239, 241–42 (5th Cir.1981) (failure to place self-destructive prisoner in padded cell violates Eighth Amendment only if it resulted from deliberate indifference); *Orpiano v. Johnson,* 632 F.2d 1096, 1101 (4th Cir.1980) (prison supervisors liable for failure to prevent beating of prisoners by guards only if supervisors' conduct was

" 'deliberate indifference' or ... 'tacit authorization of the offensive acts ...' "); *Little v. Walker,* 552 F.2d 193, 197 n. 8 (7th Cir.1977) (inadequate protection of prisoners violates Eighth Amendment if it results from deliberate indifference); *West v. Rowe,* 448 F.Supp. 58 (N.D.Ill.1978) (failure to respond to prisoner's

obscure the socially useful distinction between being "bad," on the one hand, and being merely "mistaken" on the other. To treat the "mistaken" as if they were "bad" removes an incentive to avoid evil. Use of the standard "deliberate indifference" retains the incentive and avoids treating "cruel and unusual" as describing only a type of absolute liability. A society that treats the "mistaken" as it does the "bad" must accept treating the "bad" as it does the "mistaken." The latter, at least, will prove offensive to most of us.

We do not mean to suggest that the "deliberate indifference" standard should be employed universally in determining whether certain punishment is "cruel and unusual." For example, certain prison conditions, arguably grossly disproportionate to the severity of all or most of the crimes committed by the inmates, might be the result of *public* "deliberate indifference" rather than such indifference on the part of prison officials. The good faith and deep concern of these officials would not preclude confronting a claim based on the Eighth Amendment in which substantial changes in prison conditions were sought. Our resort to the "deliberate indifference" standard, fashioned by the Supreme Court in response to charges of medical neglect of a particular prisoner, merely recognizes that a charge of legal neglect on the part of officials of the Adult Authority of an individual prisoner, which is the essence of Haygood's charges, is sufficiently similar to medical neglect to justify using the same standard. To impose a more demanding standard embraces liability without fault, which we are unwilling to do, while to impose a more lenient standard departs without good reason from equal treatment. We limit the "deliberate indifference" standard to those situations in which a prisoner complains of specific mistreatment not generally suffered by all inmates.

## IV.

### THE GOOD FAITH DEFENSE

Because we are remanding this case for a new trial we comment on the manner in which the good faith defense should function. The district court approached the good faith defense on the assumption that the defendants could have determined their computational error had they taken the trouble to study the plaintiff's file with reasonable care. *Haygood v. Younger,* 527 F.Supp. at 822–24. While we are not prepared to say that a jury could not have so found, we are convinced, after reviewing the transcript of the trial, that another view of the evidence is not unreasonable. That alternative is that neither the defendants nor their superiors saw any error in their computation and that their interpretation of the law was not unreasonable.

In light of the evidence the district court should have instructed the jury on the good faith defense in the manner required by *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). This is true, although the trial in this case antedates *Harlow,* because the essence of the defense was clearly established previously. *See Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978). Under *Harlow* government officials "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. at 816, 102 S.Ct. at 2738. Thus, the good faith defense exists if the conduct complained of does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow's* standard is objective. Of course, an official who *knows* that his conduct violates the law cannot shield himself by insisting that all others were reasonably less well informed.

We note, however, that there is some overlap between our "cruel and unusual punishment" analysis and *Harlow's* enunciation of the good faith defense. To illustrate, a proper charge on the Eighth Amendment grounds of recovery should embody the "deliberate indifference" standard set forth in *Estelle v. Gamble.* A jury

letters stating that he was in danger is actionable if it resulted from deliberate indifference).

so charged that returned a verdict finding cruel and unusual punishment under this standard could not consistently find that the defendants had proven the good faith defense. That is those "deliberately indifferent" to the plaintiff's detention could not show that they had not violated "established statutory or constitutional rights of which a reasonable person would have known."

From this, as well as our holding that the process afforded Haygood both before and after the improper deprivation of liberty met constitutional standards, it follows that a new trial must be focused exclusively on whether Haygood was subjected to cruel and unusual punishment under the "deliberate indifference" standard. The "good faith" defense has no legitimate role to play on remand. Should it be determined that the punishment was not "cruel and unusual" the defendants are absolved of all liability. A finding of "cruel and unusual" punishment, on the other hand, under the circumstances of this case, eliminates the possibility of establishing a good faith defense.

In view of the remand we set aside the award of attorney's fees without prejudice to its reinstatement or modification should the outcome of a new trial so warrant.

REVERSED AND REMANDED.