**Fred Martin SIMONS, et al., Plaintiffs,**

v.

**COUNTY OF MARIN, et al.,
Defendants.**

**No. C–86–5234 MHP.**

United States District Court,
N.D. California.

Nov. 19, 1987.

Thomas F. Bertrand, Bertrand & Fox, San Francisco, Cal., for City of Larkspur, Town of Corte Madera, City of Sausalito, City of Mill Valley, Philip D. Green, and Twin Cities Police Authority.

Jeanine Bennett Bauman, Beam & Brobeck, Santa Ana, Cal., for Orange County and Orange County Sheriff's Dept.

William Amsbary, Asst. City Atty., Huntington Beach, Cal., for City of Huntington Beach and Huntington Beach Police Dept.

Douglas J. Maloney, County Counsel, Dorothy R. Jones, Deputy County Counsel, San Rafael, Cal., for Marin County.

Bernard Zimmerman, Paula M. Weber, Pillsbury, Madison & Sutro, San Francisco, Cal., for City of Huntington Beach.

Gerald C. Sterns, William H. Curtiss, III, Sheri L. Jurnecka, Law Offices of Sterns, Walker & Grell, San Francisco, Cal., for plaintiffs.

## OPINION

PATEL, District Judge.

Around midnight on April 2, 1986, plaintiff Fred Martin Simons was mistakenly arrested pursuant to a seventeen month old warrant. Plaintiff, his wife, Cheryl Simons, and the couple's three children were removed from their home and the police searched the Simons home without benefit of a warrant. Plaintiffs brought this action for damages under 42 U.S.C. § 1983 on behalf of themselves and their three minor children for violation of the rights secured to them under the fourteenth and fourth amendments to the Constitution, also asserting pendent state law claims. The action is now before the court on defendants' motions for summary judgment. Having considered the declarations, excerpts from depositions, documents, memoranda and arguments submitted by the parties,[1] for the reasons set forth below, the court grants the motions in part and denies them in part. Defendant Marin's motion for summary judgment is continued pending further discovery.

FACTS

The series of events leading to the mistaken arrest of Fred Martin Simons ("Fred"), the removal of his wife Cheryl and their children from their home and the warrantless search of their house began in southern California, where deputy sheriff Robert John Minty, a warrant investigator for Orange County, was updating outstanding warrants for residents of Midway City on the county's computer system. This was done by entering street addresses into the computer, which would respond with the names of persons residing in (or whose last known address was in) that area and for whom there were outstanding warrants. On March 18, Minty randomly entered a block of addresses on Van Buren Street and came up with, among others, an outstanding warrant for one Fred *Michael* Simons. On that day, Minty did nothing further, as the time allotted for updating warrants had expired.

Minty returned to the results of the March 18 search on April 2. The warrant for the arrest of Fred Michael Simons, which listed the charge of attempted murder and warned that the suspect was to be considered armed and dangerous, had been issued in southern California by a Huntington Beach judge on November 11, 1984, seventeen months before. On April 2, Minty ran the warrant again and ascertained that it was still valid. Because the warrant showed an address for the suspect different from that on Van Buren Street in Midway (and also different from the plaintiffs' Greenbrae address), Minty decided to run the name "Fred M. Simons" for a driver's record through the California Department of Motor Vehicles ("DMV") computer in an effort to update the information from the warrant computer. Minty ran the name "Fred M. Simons" rather than "Fred Michael Simons" because the DMV computer will not accept more than a middle initial. The DMV computer responded with driver's record information on only one Fred M. Simons and gave the Van Buren Street address in Midway. Undaunted in his

---

**1.** After a hearing on these motions, defendant Twin Cities sent a letter brief to the court. This submission was in violation of the rules, is stricken and was not considered in making this determination.

search for more current information, Minty ran the name Fred M. Simons through the DMV database again, this time looking for vehicle registrations, and came up with one Fred M. Simons who was driving a 1977 Porsche automobile, was married to Cheryl L. Simons and was living hundreds of miles to the north, in Marin County at 124 Paseo Way, Greenbrae, California. There was nothing in the records Minty received that placed Fred *Michael* Simons in northern California at any time.

What happened next is the subject of dispute. Minty testified in deposition that after obtaining the information from the DMV computer, without further investigation, he called the Huntington Beach police department and asked for the warrant bureau. Lynda Stacy, a warrant clerk, answered his noontime call. Minty testified that he told Stacy that he wanted to speak to an investigator and that Stacy told him there was none available, but that she would take a message. Minty says that he then left a message that he had come across a Huntington Beach warrant on Fred Michael Simons, he had done a DMV check that showed a 1977 Porsche, a wife's name Cheryl L., and the Greenbrae address. Stacy replied that she was familiar with the warrant, that service previously had been attempted but that she saw no mention of Cheryl L. or a 1977 Porsche. Stacy asked where he had obtained the information, and Minty told her about the DMV check, that it had turned up only one Fred M. Simons, and that the registration was recent. Minty inferred that Stacy was a secretary and relied on her statement that she would refer the information to a Huntington Beach investigator.

Stacy's version of Minty's phone call is significantly different. On April 2, Stacy had been a civilian clerk in sole charge of the Huntington Beach police warrants division for about one month. She had previously been a police records clerk. Stacy testified at deposition that when Minty called, she pulled the worksheet on the Fred Michael Simons warrant from the file and wrote on it the information which Minty provided, including the 124 Paseo Way address, Cheryl's name, the Porsche and its license plate number. Stacy testified that

she did not ask, and Minty did not tell her, where he had obtained this information. According to Stacy, Minty said he had contacted Marin County to request service of the warrant but Marin had asked him to contact Huntington Beach to have them issue to Marin an "attempt service," that is, a request that the warrant be served, so that Marin could take action.

Having been instructed by a peace officer to send an attempt service, and without further investigation or consultation with a police officer, Stacy hung up the phone, went to the teletype machine and sent an attempt service teletype including the 124 Paseo Way address and the vehicle information on the 1977 Porsche to the Marin County Sheriff. Lying ignored in the Huntington Beach warrant file were two copies of the DMV information on Fred M. and Cheryl Simons which Huntington Beach had received on December 28, 1984 and August 6, 1985, respectively, and had apparently rejected as a basis on which to cause service of the Fred Michael Simons warrant in Marin.

On receiving Stacy's teletype, Marin forwarded the request to the Twin Cities Police Department, which had Greenbrae within its jurisdiction.

At about 2:45 p.m. on the afternoon of April 2, Twin Cities received the attempt service and began to prepare to serve the warrant. First, a detective McDuffee was dispatched to stake out the house at 124 Paseo Way. He reported back that the Porsche was not present, but surveilled the house until sometime late in the afternoon, after which the beat officer kept an irregular watch. In addition, a dispatcher called the house and asked Cheryl Simons whether "Fred Simons" lived at that address. Cheryl responded affirmatively and the dispatcher hung up.

Also, by about 3 p.m., Twin Cities officers had contacted Huntington Beach to obtain more information about the suspect. They were told Fred Michael Simons was rumoured to be a Mafia hit man, that he was wanted for shooting his own brother, that he would be desperate and try to shoot

it out with police and that he was known to use aliases and disguises.

Between 7:30 and 8 p.m., Twin Cities officer Captain James A. Cost noted the arrival of Fred *Martin* Simons in his 1977 Porsche at 124 Paseo Way. Fred, a white male, was 42 years old, stood five feet nine inches, weighed 186 pounds, was cleanshaven and his brown hair was graying. He was the owner of two local retail clothing outlets and was an active member of the community, where he had lived for 12 years. The warrant for Fred *Michael* Simons desribed a white male of twenty-nine years who stood five feet ten inches tall, weighed 170 pounds and had thinning brown hair. Seeing Fred alight from the Porsche, Cost exited his car and walked past the house to get a look at the suspect, but only caught a glimpse through the kitchen window of a man who looked to Cost to be in his mid-thirties.

Fred's arrival home was reported back to Twin Cities, where an officer ran a DMV check on the Porsche which, again, determined that the car was registered to Fred M. Simons. On the basis of this and the attempt service, Twin Cities Chief of Police Philip Green then elected to activate the Special Tactic and Rescue Team ("STAR team"), a paramilitary unit, to make the arrest.

While the STAR team was being readied, the police observed Fred and Cheryl Simons leave their three children in the care of a babysitter and go out to dinner. When they returned around 10:30, members of the STAR team had surrounded the house and a command post directing the operation had been set up at the Larkspur fire station. There Chief Green delegated most of the authority for decision making to Cost, while Green acted as news officer to Bruce Seigel, a local reporter whom Green had invited to view from the inside the workings of the STAR team.

On the return of the Simonses, their babysitter left with two women friends and the couple went to bed. Shortly after leaving the house, the babysitter and her friends were stopped by the California Highway Patrol, which had set up a road block at the end of Paseo Way at Twin Cities' request. Questioning of these women revealed that the Simonses and their children were the only occupants of the house, that there were no weapons lying about, that the babysitter did not know whether Fred's middle name was Michael and that the man at 124 Paseo Way was at least 40 years old.

Some time between 11 and 11:30 p.m., the STAR team negotiator called the Simons house, identified himself as a police officer and asked to speak with "Fred Simons." Once Fred was on the line, the negotiator asked, "are you Fred Michael Simons?" Fred answered, "Fred Martin." "Fred Martin Simons?" repeated the officer. "Yes," said Fred. "O.K. Mr. Simons, this Department is holding a warrant for your arrest." Transcript of Tape at 1, Exhibit K to Plaintiff's Memorandum.

At this point, the Twin Cities negotiator, Chief Green and Captain Cost all began to suspect that the man on the phone was not the man named in the warrant. They did, however, have information that their suspect used aliases and disguises. So a little more investigation was undertaken. Cost had the CHP question the babysitter again as to whether Simons' middle name might be Michael. More importantly, Cost called dispatch and had them run an L–1 computer check on both Fred Michael Simons and Fred Martin Simons.

The L–1, a computer check that could have been run by Minty, Stacy, or any member of the Twin Cities force prior to authorizing or serving the warrant, showed that Fred Martin Simons was in fact born in 1943 and lived at 124 Paseo Way. The Twin Cities police, however, remained unconvinced.

Fred Martin Simons was then directed, over the phone, to get out of bed, dress and go outside without any identification. He was twice searched at gun point, handcuffed, arrested and taken to the station house. At the station Fred was fingerprinted and placed in a holding cell until a fingerprint specialist could determine that he was not the man identified in the warrant. He was not allowed to call a lawyer

or his family. After three or four hours, the police returned him home.

In the interim, Cheryl Simons and the Simons children, one of whom was known to the police to be feverish, were ordered by the police to leave their home and were placed in the back of a police car. The family was not searched. The house, however, was searched, first by an officer with a police dog and then on a "walk through" by Cost. After the search, the family was returned to the house, where Cheryl Simons was questioned by Cost. She was not permitted to call her lawyer. Cheryl Simons miscarried in the early stages of pregnancy a week later.

DISCUSSION

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) ("the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" (emphasis in original)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

The court's function, however, is not to make credibility determinations. *Anderson*, 477 U.S. at 249–251, 106 S.Ct. at

2511. The inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 586–590, 106 S.Ct. at 1356–57.

The defendants[2] urge fundamentally the same arguments in favor of their motions for summary judgment. First, they contend that the plaintiffs suffered no deprivation of rights. Next, defendants maintain that their conduct was at most negligent, and that mere negligence will not state a claim under section 1983. In addition, the municipal defendants assert that liability is precluded because the plaintiffs have failed to allege the policy or custom required to establish causation. Finally, the individual defendants[3] aver that they are entitled to qualified immunity as a matter of law. This discussion will consider the merits of each argument in turn.

I. *The Standard of Liability Under Section 1983*

Section 1983 provides a federal remedy for deprivation of "any rights, privileges, or immunities secured by the Constitution and laws" caused by a person acting under color of state law. 42 U.S.C. § 1983. The elements to be pleaded and proved in order to establish a cause of action under section 1983 are that the plaintiff was subjected or caused to be subjected to a deprivation of a right secured by the federal Constitution or laws, by a person acting under color of state law. Plaintiffs are correct in their contention that they have met their burden for the purposes of this summary judgment motion.

■ The argument of Twin Cities, Huntington Beach and Orange County that a claim will not lie under section 1983 for mere negligent conduct is simply wrong.

2. Defendants County of Marin and Marin County Sheriff's Department are collectively referred to as "Marin"; County of Orange and Orange County Sheriff's Department are collectively referred to as "Orange County"; City of Huntington Beach and Huntington Beach Police Department are collectively referred to as "Huntington Beach"; and City of Larkspur, Town of Corte Madera, Twin Cities Police Authority, City of Mill Valley, City of Sausalito and Chief Green are collectively referred to as "Twin Cities."

Reference simply to "defendants" includes all the named defendants except Marin, whose motion is continued.

3. The individual defendants are limited to Huntington Beach Chief of Police Earl Robatille and Twin Cities Chief of Police Philip Green. By order of November 20, 1987, the court denied plaintiffs' motion to amend the complaint to identify Doe defendants.

Section 1983 itself imposes no standard of culpability or state of mind requirement independent of that required to make out a constitutional deprivation. *See Daniels v. Williams,* 474 U.S. 327, 329–330, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986). The standard is measured not by section 1983, but by the particular constitutional provision involved. The threshold question then is not whether the deprivation was negligent, intentional or reckless, but whether there was in fact a deprivation as measured by the standard of the particular constitutional provision or federal law at issue. *See Daniels,* 474 U.S. at 331–34, 106 S.Ct. at 665–66 (fourteenth amendment does not afford a remedy for negligent deprivation of liberty interest); *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976) (deliberate indifference to medical needs required to plead violation of the eighth amendment prohibition against cruel and unusual punishment); *Hill v. California,* 401 U.S. 797, 804, 91 S.Ct. 1106, 1110–11, 28 L.Ed.2d 484 (1971) (reasonableness, as measured by sufficient probability, is touchstone of fourth amendment analysis), *accord, United States v. Glover,* 725 F.2d 120, 122 (D.C.Cir.), *cert. denied,* 466 U.S. 905, 104 S.Ct. 1682, 80 L.Ed.2d 157 (1984). The court now turns to evaluate the deprivations alleged to have been suffered by the plaintiffs.

## II. *Constitutional Deprivations*

Plaintiffs have alleged violations of the procedural and substantive due process provisions of the fourteenth amendment and violations of the fourth amendment right to be free from unreasonable searches and seizures. Each alleged violation will be discussed in turn.

### A. *Violation of Procedural Due Process*

█ Plaintiffs argue that procedural due process was violated when defendants Orange County, Marin, Twin Cities and Huntington Beach "deliberately" relied on information they knew to be untrustworthy and failed to obtain reliable information that was easily accessible and which would have differentiated the identities of Fred Michael Simons and Fred Martin Simons. Orange County and Huntington Beach knew the registration information from DMV to be inherently unreliable. Both Minty and Stacy testified in deposition that the registration information was an inadequate basis on which to authorize service of a warrant. Neither Twin Cities nor Marin even attempted to check the information provided by Huntington Beach.

In support of this theory, plaintiffs argue that implicit in the *fourth* amendment's requirement of probable cause is the further requirement that reliable information be used to verify the identity or whereabouts of the subject of an arrest warrant, and that defendants' failure to conform to this standard violated due process. This analysis is clouded. Assuming, *arguendo,* that the fourth amendment does require reliance on trustworthy information in the service of a warrant, this is a fourth amendment requirement, not a due process requirement and its violation would necessarily result in a fourth rather than a fourteenth amendment violation.

Finally, plaintiffs analogize the defendants' failure to obtain reliable information to the conduct of the defendants found liable by the court in *Haygood v. Younger,* 527 F.Supp. 808 (E.D.Cal.1981), *aff'd,* 769 F.2d 1350 (9th Cir.1985) (*en banc*), *cert. denied,* — U.S. —, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986). In *Haygood,* the district court found that the failure of state employees to compute correctly the plaintiff's time to be served resulted in imprisonment in excess of the sentence imposed and deprivation of liberty without due process of law. 527 F.Supp. at 817–18. The Ninth Circuit affirmed, but only after making an initial determination, under the rule of *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), and its progeny, that only a pre-deprivation hearing would satisfy due process. 769 F.2d at 1357.

Under the analysis set out in *Haygood,* the court must first determine whether due process requires the state to afford the plaintiff a hearing, *see* 769 F.2d at 1356

(citing *Matthews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). If due process in fact requires a hearing, the court must turn to the principles enunciated in *Parratt* to determine whether the hearing must be held before or after the taking of life, liberty or property.[4] 796 F.2d at 1356–57.

Here, *Haygood* is inapposite because plaintiffs cannot establish a right to legal process independent of that guaranteed by the fourth amendment, that is, a warrant and probable cause. *See Baker v. McCollan,* 443 U.S. 137, 145–46, 99 S.Ct. 2689, 2695–96, 61 L.Ed.2d 433 (1979). In evaluating the plaintiff's procedural due process claim, Justice Rehnquist for the Court in *Baker* wrote,

> The Fourteenth Amendment does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished 'without due process of law.' A reasonable division of functions between law enforcement officers, committing magistrates, and judicial officers ... is entirely consistent with 'due process of law.' Given the requirements that arrest be made only on probable cause and that one detained be accorded a speedy trial, we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence.... The ultimate determination of such claims of innocence is placed in the hands of the judge and the jury.

*Id.* (footnote omitted). Failure to observe the requirements of the fourth amendment will not support an independent claim for a failure of due process, particularly in this case, where the facts supporting each claim are identical.

If the *fourth* amendment, which specifically governs the standards of arrest has not been breached, neither will the plaintiff be able to state a claim under the more general fourteenth amendment standard. Plaintiffs cannot argue that due process entitled them to any process greater than that guaranteed by the fourth amendment. They can only argue violation of the fourth amendment standard of reasonableness. *See infra,* Part C. Accordingly, the procedural due process claim is dismissed.

**B.** *Violation of Substantive Due Process*

■ Plaintiffs claim that the substantive due process rights of Cheryl Simons and the three Simons children were violated by the defendants' breach of a "special duty of care" owed to them.`` Conduct which violates substantive due process is generally described as that which "shocks the conscience," or is "offensive to human dignity." *See Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209–10, 96 L.Ed. 183 (1952); *Rinker v. County of Napa,* 831 F.2d 829, 831–32 (9th Cir.1987), *withdrawing and replacing* 820 F.2d 295 (9th Cir. 1987).

Here, although Twin Cities' conduct was intrusive and demeaning, it was not violent. The STAR team officers, though a frightening sight when clothed in black, faces blackened and carrying high powered rifles, did not attack or physically harm plaintiff Fred Martin Simons or any member of the Simons family. The case cited by plaintiffs in support of their substantive due process claim is illustrative. In *Mendez through Mendez v. Rutherford,* 655 F.Supp. 115 (N.D.Ill.1986), the defendant police officers were alleged to have pulled the plaintiff from his car, handcuffed him, and for fifteen minutes without provocation to have "brutally and savagely beat him while Elizabeth [his three-year-old

---

4. With respect to the liability of municipal defendants for fourteenth amendment procedural due process violations, it is clear that the *Parratt* analysis is not relevant. *See Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 436–37, 102 S.Ct. 1148, 1158–59, 71 L.Ed.2d 265 (1982). In *Logan,* the Supreme Court held that *Parratt* was not designed to reach a situation in which the loss was caused by operation of law or established procedure; *Parratt* is the relevant analysis only where the deprivation is "a result of a random and unauthorized act." *See Logan,* 455 U.S. at 435–36, 102 S.Ct. at 1157–58, quoting *Parratt,* 451 U.S. at 541, 101 S.Ct. at 1916. Because a municipal policy or custom is required in the first instance to state a claim for municipal liability under section 1983, *see infra,* Part III, under *Logan* the *Parratt* analysis will never apply in evaluating a due process claim against a municipality. *Brower v. County of Inyo,* 817 F.2d 540, 544–45 (9th Cir.1987), *cert. filed* Aug. 13, 1987.

daughter] watched and cried." Mendez pleaded with his attackers that his daughter was in the car and one replied, "I don't care." 655 F.Supp. at 117. In effecting the arrest of Fred Martin Simons, the defendants may not have acquitted themselves acceptably, but they did not act so egregiously as to give rise to a violation of substantive due process.

### C. Violations of the Fourth Amendment

Plaintiffs allege three separate fourth amendment violations: the warrantless search of their home, the detention of Cheryl Simons and the Simons children without probable cause and the warrantless arrest of Fred Martin Simons. Because each claim implicates a distinct issue in fourth amendment law, each will be addressed individually.

### 1. The Arrest of Fred Martin Simons

Fred Martin Simon's arrest is more accurately described as mistaken than warrantless. Orange County and/or Huntington Beach provided the arresting officers with a valid warrant. The issue is whether these defendants acted reasonably in causing the service of that warrant, issued hundreds of miles away on southern California, on the plaintiff in Marin. The court concludes that the plaintiffs have raised a triable issue of fact as to whether the defendants reasonably caused service of the warrant naming Fred Michael Simons on Fred Martin Simons.

The Supreme Court's decision in *Hill v. California*, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971), provides the fourth amendment standard for evaluating the reasonableness of a mistaken arrest. *United States v. Valez*, 796 F.2d 24, 26 (2d Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 957, 93 L.Ed.2d 1005 (1987); *United States v. Glover*, 725 F.2d 120, 122 (D.C. Cir.), *cert. denied*, 466 U.S. 905, 104 S.Ct. 1682, 80 L.Ed.2d 157 (1984). *Hill* holds that the arrest of a person other than the person sought is valid under the fourth amendment if (1) the police have probable cause to arrest the person sought and (2) the arresting officers reasonably believe the arrestee to be the person sought. 401 U.S. at 802. *See also Valez*, 796 F.2d at 26; *Glover*, 725 F.2d at 122; *United States v. McEachern*, 675 F.2d 618, 621 (4th Cir. 1982).

The first part of the *Hill* test is satisfied. It is not disputed that the warrant for Fred Michael Simons was valid; a valid warrant presumptively establishes the existence of probable cause to believe that the person named is the person who committed the crime. As for the second part of the test, however, whether the defendants who caused the warrant to be served on the plaintiff reasonably believed the plaintiff to be the person sought is a triable issue of fact.

Defendants' reliance on the rule of *Baker v. McCollan* is misplaced. In that case the Court held that *detention* pursuant to a valid though mistaken arrest is not actionable under the fourth amendment. 443 U.S. at 144–46, 99 S.Ct. at 2694–96. The petitioner in *Baker* did not challenge the constitutional validity of his arrest. Here, that question is fundamental to plaintiff's challenge of defendants' conduct. Therefore, *Baker* is inapposite to this determination, as is *Johnson v. City of St. Paul*, 634 F.2d 1146 (8th Cir.1980), also cited by defendants.

Further, the analysis of *Johnson v. Miller*, 680 F.2d 39 (7th Cir.1982), which defendants have cited as persuasive authority, has been expressly rejected by the Ninth Circuit. In *Johnson*, the court held that a claim will not lie under section 1983 for unreasonable service of a valid warrant where such claim is fully redressable under state law. *Id.* at 42. In this circuit, however, such *Parratt*-like analysis is not applicable to a claim brought under the fourth amendment. *Robins v. Harum*, 773 F.2d 1004, 1008–09 (9th Cir.1985); *accord*, *Brower v. County of Inyo*, 817 F.2d 540, 546 (9th Cir.1987), *cert. filed* Aug. 13, 1987; *Sanders v. Kennedy*, 794 F.2d 478, 481–82 (9th Cir.1986).[5]

---

**5.** Moreover, under the reasoning of the Supreme Court in the recent case of *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), the Seventh Circuit's analysis in

*Johnson*, 680 F.2d 39, is highly suspect. In *Malley*, the Court ruled that the standard applied in criminal cases to evaluate the validity of

On the basis of the evidence so far before this court, there was little if any reason, other than a superficial congruence of names, to believe that the plaintiff was in fact the man sought by the warrant. First, none of the defendants disputes that the warrant should not have been served based solely on the information provided by running "Fred M. Simons" through the DMV computer. The name is too common and the computer is unable to distinguish by a more accurate name or a birthdate. Huntington Beach's failure twice to request service of the same warrant based on the very same information is probative on this point. Second, there is a triable issue as to whether it was Huntington Beach or Orange County which was in fact responsible for issuing the request for service of the warrant. Finally, that Twin Cities did finally run a more precise check (the L–1), did obtain the information that there was in fact a Fred Martin Simons residing at 124 Paseo Way who was born in 1943, and yet was not deterred from effecting the arrest, challenges the reasonableness of its officials. (For a discussion of Marin's potential liability, see Part III, *infra*.) Plaintiffs have raised a triable issue as to the reasonableness, on the part of all defendants, of serving the warrant on Fred Martin Simons.

### 2. *The Warrantless Search of the Simons Home*

■ In the absence of probable cause and a valid search warrant, the search of a home is a per se violation of the fourth amendment. *Coolidge v. New Hampshire*, 403 U.S. 443, 474–75, 91 S.Ct. 2022, 2042–43, 29 L.Ed.2d 564 (1971). The warrant requirement, however, may be waived based on a specific showing of exigent circumstances. *Id.* The Twin Cities defend-

---

a warrant, that is, "objective reasonableness," see *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), also defines the standard for evaluating entitlement to the defense of qualified immunity in a section 1983 case. 475 U.S. at 344–45, 106 S.Ct. at 1098.

The Court reasoned that it would be "incongruous" to fail to apply the standard applicable for purposes of the exclusionary rule, which imposes the social cost of suppressing probative evidence, to a case where the cost of an unreasonable arrest could be directly imposed on the offending officer. *Id.* In addition, the Court approved that the resulting remedy in a section 1983 case would benefit the person most deserving of the remedy, that is, a plaintiff who in fact did no wrong, rather than a party who has done wrong but who is or may be excused because of the costs imposed by the exclusionary rule. *Id.*

By applying the same standard in civil cases as is applied in criminal cases, the Court has affirmed the common-sense presumption that the fourth amendment analysis employed in criminal cases is directly transplantable to section 1983 analysis. Thus, *Johnson*, which purports to apply a fourteenth amendment standard in the context of a fourth amendment case rather than the fourth amendment standard of objective reasonableness mandated in *Hill*, 401 U.S. at 804, 91 S.Ct. at 1110–1111, is rendered questionable authority.

This court agrees with the propriety of applying the *Hill* standard despite a recent spate of contrary law from the Seventh Circuit. *See Patton v. Przybylski*, 822 F.2d 697 (7th Cir.1987) (on motion to dismiss); *Brown v. Patterson*, 823 F.2d 167 (7th Cir.) (on motion to dismiss), *cert. denied*, — U.S. —, 108 S.Ct. 162, 98 L.Ed.2d 117 (1987). The court finds these decisions to be out of step with the analysis mandated by *Malley.* The Seventh Circuit analysis is even inconsistent with the somewhat more marginal notion, espoused by adherents to the law and economics school of thought, that tort relief under section 1983 is both appropriate for redressing fourth amendment violations and economically "preferable to the exclusionary rule, since it allows the sanction to be scaled to the actual social costs of the invasion of privacy caused by the illegal search." R.A. Posner, *Economic Analysis of Law* § 29.2, at 642 (3d ed. 1986).

Further, Judge Ripple, who filed a dissenting opinion in *Patton,* 822 F.2d at 701, correctly notes that the majority therein overstepped its authority in disposing of the action on review of a motion to dismiss. In noting that the courts have been successful in the cause of prohibiting the general casting of state claims as federal civil rights claims, Judge Ripple warned of the dangers of making reasonableness and credibility determinations based solely on the allegations of the complaint.

> [W]e do not serve that cause well when we act precipitously and uncritically. If we permit such judicial methodology to become commonplace …, we risk blinding ourselves to the valid civil rights complaint—a situation incompatible with the role assigned us by the Constitution and, through statutory implementation, by the Congress.

*Id.* at 702 (citations omitted).

Similarly, this court takes a dim view of making a pre-trial dispositive determination in a case such as this, where there has been a strong showing of the unreasonableness of the service of the warrant.

ants searched the Simons home without a warrant and have failed to demonstrate to this court either probable cause to search or, assuming that they did have probable cause to search, that there was an adequate substitute for a warrant.

By contrast, plaintiffs have raised significant questions as to whether there was either probable cause or an excuse for a warrant. Twin Cities had information from the babysitter and her friends that the five Simonses were the only occupants of the house and that there were no weapons lying about. More importantly, the fact that the Twin Cities defendants had all the information they were ever going to have relevant to the possibility of any exigency by three o'clock in the afternoon, fully seven hours before the arrest, yet no attempt was made to obtain a search warrant, undercuts any claim of exigent circumstances. *See Vale v. Louisiana,* 399 U.S. 30, 34, 90 S.Ct. 1969, 1971–72, 26 L.Ed. 2d 409 (1970). Similarly, defendants have not articulated facts with the specificity required to allow this court to conclude that the search was valid as a protective sweep as a matter of law. *See United States v. Dugger,* 603 F.2d 97, 99 (9th Cir.1979).

### 3. *Detention of Cheryl Simons and the Simons Children*

■ Because triable issues have been raised as to the validity of the arrest of Fred Simons and the search of the Simons home, the constitutionality of the detention or "stop" of the rest of the Simons family also remains a triable issue. *See Terry v. Ohio,* 392 U.S. 1, 24–27, 88 S.Ct. 1868, 1881–83, 20 L.Ed.2d 889 (1968). Probable cause to search the house for accomplices or to prevent destruction of evidence would support the temporary detention, but plaintiffs have raised a material dispute as to the initial validity of the search.

Plaintiffs have met the threshold burden of establishing triable issues as to the existence of fourth amendment violations actionable under section 1983.

### III. *Liability of the Political Entities*

■ The defendant political entities argue that they are entitled to summary judgment because the plaintiffs cannot allege or prove the policy or custom required to establish municipal liability under *Monell v. Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The Court ruled in *Monell* that liability under section 1983 can be imposed on political subdivisions independent of the state. This "municipal" liability, however, is limited in that it cannot be imposed on the basis of vicarious liability for the constitutional torts of municipal employees. *Id.* at 694, 98 S.Ct. at 2022. This limitation stems from the Court's interpretation of section 1983's causation requirement. *Id.* at 694–95, 98 S.Ct. at 2022–23. Thus, unless through execution of a policy or custom the municipality causes a constitutional deprivation, it cannot be held liable under section 1983. *Id.* at 695–66, 98 S.Ct. at 2038–39.

More recently, in *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), a plurality of Justices ruled that proof of only a single incident of unconstitutional activity by a police officer is insufficient to prove the existence of the municipal "policy or custom" required by *Monell. Id.* at 823–24, 105 S.Ct. at 2436–37. Each of the municipal defendants herein maintains that the mistaken arrest is an isolated incident, unique in their experience and does not amount to an actionable custom or policy.

Such heavy reliance on the narrow holding of *Tuttle* is misplaced. In that case, the trial judge had instructed the jury that evidence of a single incident of police misconduct, without more, could prove the existence of a policy or custom. Here, plaintiffs have alleged and adduced evidence to show that none of the police departments involved had trained their officers or even their personnel in charge of warrants to verify, as mandated in *Hill,* that the arrestee is probably the suspect sought.

This circuit has ruled that a policy of gross negligence in training or a policy of inadequate training is an actionable policy or custom within the meaning of *Monell. Bergquist v. County of Cochise,* 806 F.2d 1364, 1370 (9th Cir.1986). As the Supreme

Court made clear in *Hill*, there are two steps to effecting a valid arrest under the fourth amendment. The mere issuance of a warrant based on probable cause is not sufficient. In addition, the *service* of the warrant must be reasonable. *See* 401 U.S. at 802, 91 S.Ct. at 1110. Thus, the police must reasonably believe that the person arrested is probably the person named in the warrant. While this court does not suggest that minor discrepancies between a warrant description and an arrestee should be grounds to invalidate an arrest on fourth amendment grounds, if the police entirely fail to train their officers in the appropriate manner of reissuance or service of a warrant, they have effectively created a climate in which the guarantees of the fourth amendment are rendered superfluous because they are ignored. Allegations of a defendant's failure to train personnel responsible for authorizing and serving warrants in the necessity for or appropriate methods of ascertaining probable cause to serve the warrant thus will state a claim for municipal liability under section 1983.

Plaintiffs have alleged facts and adduced evidence sufficient to create a triable issue as to whether defendants failed in their duty to train their employees to be sufficiently diligent in the protection of fourth amendment guarantees. Not only have plaintiffs alleged this instance of mistaken arrest, they have also demonstrated that the defendants did not then and do not now have any system to ensure the probability of valid arrest. With respect to Orange County, plaintiffs have submitted evidence that neither at the time of the events relevant to this action nor since has that defendant had any policy or given any training to the very officers responsible for updating warrants on appropriate methods for updating outstanding warrants. *See* Plaintiff's Ex. A, Minty Dep. at 44. Orange County, by contrast, has adduced no evidence to refute plaintiff's contention that the municipality was grossly negligent in this failure to train, and that this failure caused the mistaken service of the warrant.

Similarly, plaintiffs have created a triable issue as to the liability for failure to train of Huntington Beach. Stacy testified that she was solely in charge of the Huntington warrants division, but she did not attempt to verify the information relayed to her by Minty because there was no policy in existence which required her to check. Plaintiff's Ex. B, Stacy Dep. at 31–32. In fact, some evidence suggests that Stacy was trained simply to act on unverified information from other agencies and that no steps have been taken to change this procedure. *See id.* Thus, there is sufficient evidence that Huntington Beach's failure to train caused the mistaken arrest.

In addition, the plaintiffs have adduced facts tending to show that Twin Cities may have had a policy of routinely searching the homes of arrestees without benefit of a search warrant, as well as raised questions as to the adequacy of training with respect to service of a warrant. One Twin Cities officer gave testimony which indicates that it may be routine for the STAR team to "secure" a house after an arrest, with or without benefit of a warrant. Plaintiff's Ex. D, Hoke Dep. at 87–89. Hoke's testimony creates a triable issue as to whether Twin Cities routinely searches the homes of suspects arrested outside of their homes and falsely justifies them as "incident to arrest."

The motion of Marin for summary judgment is continued pending further discovery to determine whether Marin participated in the actual service of the warrant. No cause of action is stated for merely having forwarded the request for service of the warrant issued by another department.

## IV. *Liability of the Individual Defendants—Qualified Immunity*

■ The availability of qualified immunity for individual defendants on summary judgment is tested under the rule of *Anderson v. Creighton*, — U.S. —, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) and *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). *See Schlegel v. Bebout*, 831 F.2d 881, 887–888 (9th Cir. 1987). In *Anderson*, the Court ruled that the appropriate inquiry is whether, in light

of (1) the information possessed by the officer and (2) clearly established law, the officer could have reasonably believed his actions to be lawful. 107 S.Ct. at 3039–40. In *Malley,* the Court reaffirmed the holding in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), that this evaluation must be based on a test of "objective reasonableness." *Malley,* 475 U.S. at 344–45, 106 S.Ct. at 1098. In *Schlegel,* the Ninth Circuit clarified the standard to be applied under *Anderson* and ruled that the existence of a reasonable belief that conduct was lawful in light of clearly established law is a jury question, not appropriate for summary disposition. At 887–88.

Plaintiffs have raised significant issues as to the objective reasonableness of the individual defendants' belief that service of the warrant and the search of the Simons home were constitutional. These concerns were discussed, *supra,* Part II, with respect to the fourth amendment issues.

At the time of the events in issue, under *Hill v. California (see* discussion, *supra,* Part II.C.) it was clearly established that an officer must have reasonable probability to believe that the person served is the person named in the warrant in order for the arrest to pass fourth amendment muster. Plaintiffs have raised triable issues as to whether the officers involved are credible in their assertions that they reasonably believed that plaintiff Fred Martin Simons was the man named in the warrant. *See Schlegel,* at 887–88. None of the officers checked any information on the man they were serving; they checked only the information on the suspect named in the warrant. Further, once information was obtained which tended to rebut the assumption that plaintiff was in fact the suspect, no further investigation, though possible, was undertaken, nor was the operation aborted. Defendants argue that in the face of such contradictions they would have been remiss in failing to complete the arrest. The only reason given to explain their continuing confusion is that the suspect was known to use aliases. Why a fugitive would use an alias so similar to his own name, however, escapes the court.

In addition, with respect to the Twin Cities officers, no evidence has been adduced supporting the reasonableness of their search of the Simons house as either incident to arrest, a protective sweep or required by exigent circumstances. Therefore, the individual defendants are not entitled to summary judgment based on qualified immunity. *See id.*

### V. Pendent State Claims

Defendants seek summary judgment on plaintiffs' pendent state claims for false arrest and imprisonment, assault, battery, invasion of privacy and defamation. In the first instance, defendants argue that the state claims should be dismissed because plaintiffs have no federal claims. Because the court has ruled in favor of plaintiffs on the federal claims, this argument is unavailing.

Second, defendants maintain that the pendent claims for false arrest, false imprisonment and assault are barred under California Civil Code § 43.55 on the grounds that their actions were reasonable as a matter of law. The court has already ruled, however, with respect to the plaintiff's fourth amendment claims, that there is a triable issue of fact as to the objective reasonableness of each defendant's conduct. The fourth amendment analysis is equally applicable in consideration of the limits of California Civil Code § 43.55. *See Robinson v. City and County of San Francisco,* 41 Cal.App.3d 334, 337, 116 Cal. Rptr. 125 (1974) (reasonableness of an act is made a triable issue of fact by particular facts of the case).

As to the claims for defamation and invasion of privacy, defendants have not made a serious attempt to argue for summary judgment and plaintiffs have adequately responded to the motion and raised material issues of dispute. Therefore, the motions to dismiss the pendent state claims are denied.

Accordingly, the motions of defendants Orange County, Huntington Beach and Twin Cities are granted in part and denied

in part. The motion of defendant Marin is continued pending further discovery.

IT IS SO ORDERED.